[No. 3966.  Decided December 7, 1901.]

WILLIAM H. OPIE, as *Administrator, Respondent,* v. PA-
CIFIC INVESTMENT COMPANY *et al., Appellants.*

FRAUD — FIDUCIARY CAPACITY — PRINCIPAL AND AGENT.

The fact that a sale had been ultimately effected through a
broker who had originally written to the vendor, who was a
non-resident, offering to find a purchaser for his property, would
not establish a fiduciary relation between the vendor and broker,
when the evidence shows that the vendor dealt with such broker
at arm's length, treating him as a possible purchaser instead of
agent, and constituting a local bank his agent to close with such
broker on specified terms.

SAME — SURETY.

An indorser or surety upon a promissory note does not occupy
such a fiduciary relation towards the payee as to require him to
make full disclosure to the payee of the value of the securities
held by him for the payment of the note.

SAME — INADEQUATE PRICE — RESCISSION.

Mere inadequacy of consideration will not afford cause for
rescission of a contract on the ground of fraud, where the parties
have dealt at arm's length, with avenues of information open
to the one claiming fraud, and where the agreement is entered
into after the exercise of the independent judgment of each of
the parties.

Appeal from Superior Court, Pierce County.—Hon.
JAMES A. WILLIAMSON, Judge. Reversed.

*T. L. Stiles,* for appellants.

*Bogle & Richardson* and *Bates & Murray,* for respond-
ent.

The opinion of the court was delivered by

DUNBAR, J.—On October 9, 1891, the Commercial In-
vestment Company of Tacoma executed its note to the
Mason Mortgage Loan Company for $2,000, payable five
years after date, and its mortgage to secure said note on

a five-acre tract of land in Pierce county, known as "Excelsior Park Tract, No. 19." T. O. Abbott indorsed the note. On November 4, 1891, the Mason Mortgage Loan Company assigned the note and mortgage to Theodore B. Deming, for whom (he having deceased since the commencement of the action) William H. Opie, administrator of his estate, was substituted as plaintiff in this case. About May 6, 1899, Deming sold said note and a sheriff's certificate to a tract of land in Tacoma to one M. J. Adams for $275; appellant Abbott acting as agent for Adams in the purchase of the mortgage and sheriff's certificate of sale. For convenience the assignments were made to appellant L. H. Wheeler. On the 10th day of September, 1892, the Commercial Investment Company, the mortgagor mentioned, conveyed tract No. 19 of Excelsior Park to the National Bank of Commerce; and the bank, by the terms of the deed, assumed the mortgage of respondent, and agreed to pay it as part of the purchase money. It is conceded that Abbott knew of this assumption on the part of the bank. The bank refusing to pay its assumed liability, action was brought by Wheeler to foreclose the mortgage, execution was issued, and the amount of the mortgage was collected from the bank aforesaid. This action was commenced in May, 1899, and judgment was rendered on December 27, 1899, against the bank, which appealed to the supreme court of this state, but which appeal was dismissed; the merits of the case not having been reached. On December 15th of that year the present action was commenced by Deming to rescind the sale of the mortgage on the ground of fraud having been perpetrated upon him by Abbott, the surety on the note, and by the Pacific Investment Company, J. H. Easterday, T. O. Abbott, L. H. Wheeler, M. J. Adams, and the Commercial

Investment Company. It is claimed by the respondent that, Abbott being a surety on the note, a fiduciary relation existed between him and Deming, which created a duty on his part to inform Deming of the true value of the mortgage, or to inform him of the fact that the National Bank of Commerce was responsible for the payment of the same; and it is also claimed that the Pacific Investment Company, through Easterday, had been the agent of Deming in the sale of the mortgage; that Easterday was aware of the true value of the mortgage, and of the liability of the National Bank of Commerce to pay the mortgage, and had failed to notify Deming of that fact. The complaint tendered the $200 alleged to have been paid for the mortgage, and asked for a rescission of the contract. Upon the trial of the cause the court found that Deming did not know of the assumption of the note and mortgage by the bank until after he had signed and delivered the same; that, if he had known the real facts concerning said note and mortgage, he would not have parted with the same for $200, nor for any sum less than approximately their face value; that he was not informed by either Abbott or Easterday or the said Pacific Investment Company that said note had been assumed by said National Bank of Commerce. As conclusions of law, the court found that Easterday, in the name of the Pacific Investment Company, was, in law, the agent of Deming for the purpose of negotiating the sale of said note and mortgage, and in all of said negotiations was responsible and in duty bound to said Deming as his agent; that Abbott occupied such relation to Deming as bound him to disclose the existence of the security furnished by the assumption of the payment by the bank; that there were such misrepresentations and suppressions by the defendants Abbott

and Easterday in the negotiations for the transfer of said note and mortgage by said Deming as amounted to fraud, in law, and that Deming was entitled to have the assignment from Deming to Wheeler and from Wheeler to Adams canceled, set aside, and held for naught, and the sale rescinded; enjoining the defendants from taking any action to collect the proceeds of said note and mortgage which had been collected in the foreclosure suit, and giving judgment against the defendants for costs in this action. Decree was entered in accordance with these findings and conclusions of law, and from this decree an appeal is taken.

Passing without deciding many of the errors alleged by the appellants, viz., that the decision by Judge Williamson alone was insufficient, the case having been partially tried by Judge Williamson and Judge Carroll *in banc;* the fact that the offer to rescind comprehended only a portion of the contract; that the findings tended to support a different case from that made by the pleadings; that the decree was inequitable, from the fact that Deming had allowed Wheeler to go to the expense and trouble of a lawsuit against the National Bank of Commerce to establish the responsibility of that bank for the payment of the mortgage, without any attempt on the part of Deming to intervene, and without any offer to reimburse Wheeler for expenses incurred; and that there was no proof of the value of the property at the time of the sale,—we do not think the judgment can be justified upon the merits of the case. The record does not establish the fact that the Pacific Investment Company was the agent of Deming, through Easterday,. in the sale of this mortgage. It is true that the Pacific Investment Company sent one of its circular letters to Deming, calling attention to the fact

that it had customers for real estate mortgages and real estate at reasonable figures, and telling him that, if he would quote it a price, it would endeavor to secure a buyer. But Deming certainly never authorized it in any communication to act as his agent, but treated it all the time as the purchaser. In answer to the circular letter, Deming said: "I have a mortgage on the lot No. 19, Excelsior Park tract, of $2,000, given by the Commercial Investment Company. What will you give for it?" The company answered this letter, stating that the lot was worth three or four hundred dollars, and that the value of the mortgage would depend upon the solvency of the mortgagor. Deming answered, stating that he had heard that "the Commercial Bank, or may be the Bank of Commerce, held a second mortgage on the property," and suggesting that he would send out the papers to some one for inspection if a satisfactory price was offered. After a considerable correspondence, Deming sent the mortgage to the National Bank of Commerce, at Tacoma, for inspection; the National Bank of Commerce being the same bank which in his first letter he notified the Pacific Investment Company was the bank which held the second mortgage on the lot. On April 18, 1899, he wrote to the company— the papers having once miscarried,—stating that he had remailed the papers to the National Bank of Commerce, "with directions to let you see them, and, if you wanted them on the terms I stated there, they might close the sale." The following is the letter sent to the bank:

"West Brattleboro, Vt., April 5th, 1899. President of National Bank of Commerce, Tacoma, Wash.—Dear Sir: I inclose with this a note of $2,000, secured by first mortgage on Excelsior Park tract, number nineteen, of five acres, more or less, situated near the car shops of the North. Pacific Railroad, with the coupons due Oct. 19th,

1895, April 19th, 1896, and Oct. 19th, 1896, of $90 each, and also the first mortgage, its assignment to me, and the certificate of title furnished by the Mason Mortgage Loan Co.   I also enclose a certificate of title furnished by the same company to N. E.¼ of S. E. ¼ of Sec. 7, township No. 20 north, range 5 east of Willamette meridian,—40 acres, more or less.   This has been foreclosed, but the sheriff's certificate of sale cannot be found; and an affidavit will have to be signed by me to show this, before duplicate or sheriff's deed can be obtained.   The Pacific Investment Co., of the Bernice Building, Tacoma, S. G. Crandall, manager, have written to me for prices of my different pieces of property there, and I gather from their letter that they would be likely to take the mortgage at two hundred dolls., and the Aitkin 40-acre lot at seventy-five dollars, making together $275.   I know nothing about them, and would like to have you show them these papers; and if they want to buy at the above prices, and pay all costs of perfecting title and the accrued taxes, please have them pay the money into your bank, and the transfer may be made through your bank.   I think the price low, but it must be taken subject to costs and taxes.   I would like you to see the business properly done.   Respectfully, T. B. Deming."

Unquestionably, Deming made the National Bank of Commerce his agent, instead of the Pacific Investment Company, or Easterday, through whom it carried on its correspondence.   The letter expressly shows that Deming was not placing confidence in Easterday, but that he treated him as a purchaser whose interests were opposed to his, and that the confidential relations were between him and the bank, to whom he sent the papers, with direction to complete the sale.   This is the only testimony there is as to the agency of Easterday, and, outside of the testimony of Easterday, which, so far as we can judge, is straightforward and entitled to credit, the showing made by Deming would not be sufficient to establish

agency. It is, however, earnestly contended that Abbott conspired with Easterday to keep from Deming the knowledge of the actual value of the property, and that at least there was a fiduciary relation existing between Abbott and Deming that constituted him a trustee for Deming, and made it his duty to furnish Deming with all the information that he had as to the value of the land. Abbott was an indorser of the note, and, being an indorser, if he was not notified of the nonpayment of the note when it became due he would be released from liability. But, regarding him as a surety, there was no trust relation existing between him and Deming. In § 902, 2 Pomeroy, Equity Jurisprudence, under the title of "When Duty to Disclose Exists," a classification is made as follows: (1) Where there is a previous, existing, definite, fiduciary relation existing between the parties, so that the obligation of perfect good faith and of complete disclosure always arises from the existing relations of trust and confidence, and is necessarily impressed upon any transaction which takes place between such persons; (2) where there are no existing fiduciary relations, but where one or each of the parties in entering into the contract expressly reposes a trust and confidence in the other, or where such trust and confidence are necessarily implied; (3) where there is no existing fiduciary relation between the parties, and no special confidence reposed is expressed by their words or implied from their acts, but where the very contract or other transaction itself, in its essential nature, is intrinsically fiduciary, and necessarily calls for perfect good faith and full disclosure, without regard to any particular intention of the parties,—a contract of insurance being a familiar example of this class. It does not seem to us that a surety on a note falls within either of the three classes, so far as the creditor is concerned. The rule is

laid down in 14 Am. & Eng. Enc. Law (2d ed.) p. 67, in relation to disclosure, that by the decided weight of authority the general rule is the same in equity as at law, and to the effect that mere non-disclosure or silence is not fraud, for the purpose of rescission or cancellation, in the absence of special circumstances imposing the duty to speak. Of course, if the circumstances surrounding the contract imposed a duty upon one of the parties to disclose all material facts known to him and not known to the other, want of disclosure, with intent to deceive, will amount to fraud. The difficulty is not so much in stating the general principles of law, which are pretty well understood, as in applying the law to particular groups of facts. There are certain circumstances and conditions surrounding parties to contracts which bring them within the rule of duty to disclose, for instance, the relations of trustee and *cestui que trust,* principal and agent, attorney and client, physician and patient, priest and parishioner, partners, tenants in common, husband and wife, parent and child, guardian and ward, and many others of like character; but we find no cases holding that such a trust relation exists between the surety or indorser on a note and the principal as would raise the presumption of duty on the part of the surety to disclose to his creditor, and the surety is in no sense that we can comprehend a trustee for the creditor. If so, what does he hold in trust? There is nothing between them but the legal obligation of the surety to pay in case the principal does not. This legal obligation is in the hands of the creditor, and it is for him to take the initiative in using it to his advantage. Section 907, 2 Pomeroy, Equity Jurisprudence, is cited by the respondent to sustain the theory that it was the duty of the surety to disclose to the creditor. But we do not think it was the intention of the author to lay down such a

rule. After stating the general doctrine, the author says:

"The contract of suretyship, in the relations between the surety and the other parties, and especially the creditor, is also fiduciary, although not in the same degree as that of insurance. It demands good faith towards the surety, and while the creditor is not absolutely bound voluntarily to disclose every fact which might affect the contract, very slight incidents and collateral circumstances will render his concealment of material facts fraudulent."

This doctrine is for the protection, not of the creditor, but of the surety, and is founded in manifest justice; and the cases cited are those where the surety was pleading want of good faith on the part of the creditor. Respondent cites *Solicitors Loan & Trust Co. v. Robins,* 14 Wash. 507 (45 Pac. 39), in support of his contention. In that case it was decided by a bare majority of this court that on foreclosure of a mortgage upon land which had been subsequently conveyed by the mortgagor to another, who assumed payment of the mortgage, the grantee and his wife, when such land was their community property, were subject to a deficiency judgment, which could be enforced against their community property and the separate property of the husband; and although the court cited *Keller v. Ashford,* 133 U. S. 610 (10 Sup. Ct. 494), it stated specifically that all that was necessary to decide in that case was that the plaintiff was entitled to a deficiency judgment against the respondents, Robins and wife, and that was all that plaintiffs sought. But *Keller v. Ashford, supra,* decides nothing more than was decided by this court in the case in which it was cited, viz., that an agreement in a deed of real estate by which the grantee assumes the payment of a mortgage made by the grantor is a contract between the grantee and the mortgagor only; and does not, unless assented to by the mortgagee, create

any direct obligation, at law or in equity, from the grantee to the mortgagee. But the mortgagee may avail himself in equity of the right of the mortgagor against the grantee. And if the mortgagee, after the land has been sold under a prior mortgage for a sum insufficient to pay that mortgage, and after he has recovered a personal judgment against the mortgagor, execution upon which has been returned unsatisfied, brings a suit in equity against the grantee alone, and the omission to make the mortgagor a party is not objected to at the hearing, no ground is afforded for refusing relief. That was a case where the mortgagor, as in the trust company case just referred to, sold the mortgaged property; the grantee promising to pay the mortgage. The supreme court of the United States in that case reviews somewhat the history of the relation existing between grantees, mortgagors, sureties, and creditors, and after stating that the promise of Ashford, the grantee, was to Thompson, the mortgagor, and not to the mortgagees; that there was no privity of contract between them and Ashford, the consideration moving to Thompson alone; that the only object of the promise was to benefit him, and not to benefit the mortgagees or other incumbrancers; that they did not know of or assent to the promise at the time it was made, nor afterwards do or omit any act on the faith of it,—said, "It is clear, therefore, that Thompson only could maintain an action at law upon that promise;" citing many cases holding that in equity, as at law, the contract of the purchaser to pay the mortgage, being made with the mortgagor, and for his benefit only, creates no direct obligation of the purchaser to the mortgagee. But the court proceeded to say that it had been held by many state courts of high authority, in accordance with the suggestions of Lord HARD-WICKE in *Parsons v. Freeman,* Amb. 116, that in a court

of equity the mortgagee may avail himself of the right
of the mortgagor against the purchaser; that this result
had been attended by a development and application of
the ancient and familiar doctrine in equity that a creditor
shall have the benefit of any obligation or security given
by the principal to the surety for the payment of the debt.
It was especially stated that the doctrine of the right of a
creditor to the benefit of all securities given by the prin-
cipal to the surety for the payment of the debt does not
rest upon any liability of the principal to the creditor, or
upon any particular relation of the surety towards the
creditor, but upon the ground that the surety, being the
creditor's debtor, and in fact occupying the relation of
surety to another person, has received from that person
an obligation or security for the payment of the debt,
which a court of equity will therefore compel to be ap-
plied to that purpose at the suit of the creditor. It is
easy to ascertain what class of sureties the court was talk-
ing about, for it cited approvingly the following state-
ment from the court of appeals of New Jersey in *Crowell
v. St. Barnabas Hospital,* 27 N. J. Eq. 655, where it was
said:

"The right of a mortgagee to enforce payment of the
mortgage debt, either in whole or in part, against the
grantee of the mortgagor, does not rest upon any contract
of the grantee with him, or with the mortgagor for his
benefit.   .   .   .   The purchaser of lands subject to
mortgage, who assumes and agrees to pay the mortgage
debt, becomes, as between himself and his vendor, the
principal debtor, and the liability of the vendor, as be-
tween the parties, is that of surety. If the vendor pays
the mortgage debt, he may sue the vendee at law for the
money so paid."

It is expressly stated that the right of the mortgagee to
this remedy does not result from any fixed or vested right

in him, or from any obligation to him, but that he is allowed, by a mere rule of procedure, to go directly, as a creditor, against the person ultimately liable, in order to avoid circuity of action, and save the mortgagor, as the intermediate party, from being harassed for the payment of the debt, and then driven to seek relief over against the person who has indemnified him, and upon whom the liability will ultimately fall. "The equity," says the court, "on which his relief depends is the right of the mortgagor against his vendee, to which he is permitted to succeed by substituting himself in the place of the mortgagor." There is no intimation or inference that there is any fiduciary relationship existing between the surety and the creditor in these cases, and nothing else is decided than that the creditor shall be allowed to recover directly of the grantee the amount due upon the mortgage. We have examined the other cases cited by respondent, but do not think they are applicable to the facts of this case. The evidence does not tend to show collusion or fraud in any way between Easterday and Abbott. Easterday was attempting to purchase the land for his client and friend, Freum; the negotiations being delayed until after Freum had left the state for the Northwest Territory, when Easterday told Abbott that some of his paper was being offered for sale. Abbott then stated that he had a client who might buy it, and this client, Adams, afterwards did buy the judgment; and there is no testimony that he was not a *bona fide* purchaser of a commodity that was offered openly in the markets.

The only thing left in this case is whether fraud can be concluded from the inadequacy of the price. Section 926, 2 Pomeroy, Equity Jurisprudence, says:

"The rule is well settled that where the parties are both in a situation to form an independent judgment concern-

ing the transaction, and acted knowingly and intentionally, mere inadequacy in the price or in the subject-matter, unaccompanied by other inequitable incidents, is never of itself a sufficient ground for canceling an executed or executory contract.   .   .   .   In some of the earlier decisions, mere inadequacy, either in the price or in the value of the subject-matter, was held to be a sufficient hardship which might defeat the specific performance of an executory contract when set up as a defense.   The doctrine, however, is now settled, that mere inadequacy—that is, inequality in value between the subject-matter and the price—is not a ground for refusing the remedy of specific performance; in order to be a defense, the inadequacy must either be accompanied by other inequitable incidents, or must be so gross as to show fraud.   In short, inadequacy as a negative defense, and as an affirmative ground for a cancellation, is governed by one and the same rule."

"If the parties to a contract have dealt at arms' length, and the contract entered into is the result of a mutual agreement based upon the independent judgment of each, any valuable consideration—no matter how inadequate or disproportionate to the benefit obtained it may be—is sufficient, in the absence of fraud, to sustain the contract." 10 Am. & Eng. Enc. Law, 326.

There are no circumstances coupled with this case to take it out of the general rule.   There is no fiduciary relation existing.   There was no weakness of mind on the part of the creditor.   All the avenues of information were open to the seller that were open to the purchaser.   It is true that he did not live in Tacoma, but he was doing business there, and had an opportunity to inquire concerning the value of his property of the bank which he made his agent for its sale, knowing that this bank had some business relations with this property, for he stated in his letter that he had understood that it held a second mortgage on the property.   He

was a man who had been engaged in the business of buying securities. There was a serious question in the minds of lawyers as to whether or not the National Bank of Commerce was responsible for the payment of this mortgage. A lawsuit was necessary for the determination of that question. It is a matter of public history that property in Tacoma at that time was almost valueless, that purchasers could not be obtained at any price, and that even the solvency of banks was a question of great public interest and apprehension. It is a reasonable presumption from all the testimony that Deming felt that his investment in Tacoma was an unfortunate one, and that the acceptance of anything he could get for his securities, to prevent total loss of his investment, would be an act of good judgment; that he exercised his judgment in this respect; that there was no attempt on the part of any one to mislead or deceive him; and that he alone is responsible in law and in equity for the effect of the bad bargain which he made.

The judgment will be reversed, the application for rescission denied, and the cause dismissed at the expense of the plaintiff.

REAVIS, C. J., and FULLERTON, HADLEY, MOUNT, ANDERS, and WHITE, JJ., concur.