Allen, P.
It appears from the pleadings and proofs in this cause, that the father of the appellee departed ' this life intestate about fourteen years before the institution of this suit; that he owned at the time of his death a house and lot in the village of Mount Sidney, Augusta county, and an out lot containing about eleven acres, adjoining the village. He left four children, (all infants,) one of whom died under age. The appellee was the eldest child; and when he attained his full age on the 24th of November 1851, he was the owner of an undivided one-third of said property, subject to the dower interest of his mother. The estate was a vested interest, two-thirds a present, and one-third an interest in reversion; the whole was in the occupation and possession of his mother, to whom dower had not been assigned. Immediately after arriving at full age, the appellee offered his interest in the property for sale to sundry individuals. In less than two months after he attained his majority, he made sale of it to the appellant for one hundred and sixty dollars, of which one hundred dollars was to be paid down, and sixty dollars to be paid in nine months, in paper. On the 16th day of January 1852 the appellee conveyed the property to the appellant: on the tenth of March thereafter his mother died with pulmonary consumption, after a confinement to her bed of about a month. The appellee instituted this suit on the 20th of March 1852 to set aside the sale, and to annul the deed, upon two grounds : First, of actual fraud, circumvention and imposition on the part of the appellant; and second, of constructive fraud, supposed to be imputed by the policy of the law to such a bargain, growing out of the mere inadequacy of price. The evidence shows *497 that the appellee had not actually resided with his mother for several years before he attained full age; and that for some years he had been doing business for self, uncontrolled by his mother, or any other person. But as he was a frequent visitor at her house, he had better opportunities than the appellant of informing himself of the condition of her health. There is no allegation in the bill, or anything in the proof to show, that the appellee was not fully acquainted with his rights and the extent of his interest in the property when he contracted to sell it. He seems to have been a young man of at least ordinary intelligence, and as he had been doing business on his own account for some years, he must have had some experience in dealing. At the time of the sale he was indebted in a sum not exceeding fifty dollars, but no portion thereof was due to the appellant; and it is not proved that there was any relation of confidence between the parties. The proposition to sell appears to have been made by the appellee to the' appellant, and this after he had been offering his interest in the property for sale to others. Upon the facts in the record the court below held, and as I think correctly, that there was not the least reason for imputing any actual fraud to the appellant in this transaction.
In view of the facts that the property was undivided; that dower had not been assigned; that the widow, from the death of her first husband, had been, and at the time of the sale was, in the actual possession of the whole thereof, the court below seems to have considered that the interest sold by the appellee was merely reversionary. So regarding it, the question is presented for the first time in this court for direct adjudication, How far it is incumbent on the party dealing with the seller of such an expectant interest to establish, not only that there was no actual *498 fraud, but that he had agreed to pay a fair and adefiua^e consideration ?
In reference to expectant heirs, and those sustaining character, the doctrine seems now to be fully established in England that they are entitled, for mere inadequacy of price, to have the contact rescinded upon the terms of refunding the money and interest received. In Edwards v. Burt, 15 Eng. Law & Equ. R. 434, decided in 1852, the Lord Chancellor observes, that “ it is unnecessary to canvass or discuss the principles on this subject, for the rule on it was finally and distinctly established by the house of lords in the case of Lord Aldborough v. Frye; and that case following several of the previous authorities, clearly establishes that the pui’chaser of a reversionary interest, or, at all events, the purchaser of such an interest from an expectant heir, or from a person standing in the situation of an expectant heir, (and the plaintiff Mrs. E. clearly sustained that character,) is bound, if the transaction is impeached within a reasonable time, to satisfy the court that he gave the fair market value for what he purchased.”
In that case property had been bequeathed to the mother of Mrs. E. for life, with remainder to Mrs. E. for life. At the time of the sale, the mother was seventy-four years of age, and Mrs. E. was thirty-eight. So situated she clearly sustained, according to this opinion, the character of one standing in the situation of an expectant heir.
After this recent and unequivocal recognition of the rule as finally established, it is unnecessary to review the long series of cases upon this subject. They will be found, and the substance of them set out and commented upon in the note to the case of Lord Chesterfield v. Janssen, in White & Tudor’s Selection of Leading Cases in Equity, p. 344, 393. See also Davis v. Duke of Marlborough, 2 Swanst. R. 113, 147, n. a. *499 Contracts with persons, sustaining the character of expectant heirs, entered into during the lifetime of the parent or relation standing in loco parentis, for the purchase of interests dependent upon the bounty of such parent or relation, may be obnoxious to the imputation of fraud on the rights and interests of the parent or relation. In Chesterfield v. Janssen, 2 Ves. sen. 125, 156, Lord Hardwicke said, “A fraud may be collected or inferred in the consideration of this court, from the nature and circumstances of the transaction, as being an imposition and deceit on other persons not parties to the fraudulent agreement.” Under this head he enumerates marriage brocage contracts, in which neither of the contracting parties are deceived, but they tend to deceive others; contracts to return a part of the portion of the wife; contracts by some creditors, to secure a larger portion of their debts, before they will unite in a deed of composition with other creditors ; and in the same class he mentions catching bargains with heirs, reversioners and expectants, in the lifetime of the father, &c. • “ The father, ancestor, or relation from whom was the expectation of the estate, is kept ignorant, and is so misled and seduced to leave his estate, not to his heir or family, but to a set of artful persons who have divided the spoil beforehand.” In conformity with this rule, it was held in Boynton v. Hubbard, 7 Mass. R. 112, that a contract made by an heir to convey, on the death of the ancestor living the heir, a certain undivided part of what should come to the heir by descent, devise or distribution, was a fraud upon the ancestor. This deceit, says Parsons, C. J. is relieved against as a public mischief, as being a deceit on the father or other relation, who is thus influenced to leave his fortune to be divided amongst a set of common adventurers, and because it is destructive of all well regulated control or authority *500 of persons over their children or others having expecNations from them.
The rule, when limited and restricted to the sale of eXpectancies of the above description, may "be sustained by principles applicable alike to all well regulated communities. It is the policy of every well constituted society to protect against fraud, and to suppress vice. Contracts with young heirs for mere expectancies dependent upon the bounty of the relation, tend to encourage both. They are most generally entered into for. the purpose of ministering to some secret, vicious indulgence. A deceit is practiced on the owner and disposer of the property, and the necessity of concealment subjects the expectant heir, generally young and inexperienced, to oppressive sacrifices.
In the note to Davis v. Duke of Marlborough, 2 Swanst. R. 113, 147, the annotator states that the principle laid down in some of the cases as that on which the doctrine is in part founded, would seem, to comprehend every person dealing for a reversionary interest ; yet he raises the question, Whether, in order to constitute a title to relief, the reversioner must not combine the character of heir? He remarks, that the reversionary interests, the sale of which has been rescinded from mere inadequacy of price, were expectant on the decease of a parent or other lineal ancestor in every instance, except in a few cases which he enumerates, in all of which the sales have been made while the vendors were in distress, and so the transactions were affected with actual fraud.
The doctrine of imposing upon a purchaser from a reversioner who does not sustain the character of an expectant heir, the heavy burden of showing, in all cases and at all times, that he has paid a full and adequate consideration, has not always been acqui *501 esced in as correct. In some of the earlier cases an opposite rule has been acted on. Thus, in Nicols v. Gould, 2 Ves. sen. 422, Lord Hardwicke refused to set aside the purchase of a reversion at an under value, there being no fraud. He observed, “ there is no proof of any fraud, or imposition on the vendor; nothing but suspicion; and therefore it is too much to set aside the purchase merely on the value.” In Griffith v. Spratley, 1 Cox’s Cas. 383, the subject of sale consisted in part of a reversion. Lord Chief Baron Eyre remarked, “ that the case had been much rested upon this, that the satisfaction received was so inadequate in value that it was impossible to resist the inference of fraud which arises from such inadequacy; or if possible, to make inadequacy itself a distinct principle of relief in equity. But that he knew of no such principle, and the common law knows of none such; that he would never agree that inadequacy of consideration is in itself a principle upon which a party may be relieved from a contract he has wittingly and willingly entered into. But it may be a strong evidence of fraud when the transaction is such as to be inconsistent with the sober manner of a man’s conducting his affairs.” In Wood v. Abrey, 3 Madd. R. 417, the vice chancellor, Sir Jno. Leach, in reply to the argument, that the party was entitled to relief on the ground of the purchase being of a reversion, unless the purchaser could show that the consideration was adequate, observed, “ That the policy of this rule as to reversions may be well doubted, and if the cases were looked into it might be found, that the rule was originally referred only to expectant heirs, and not to reversioners.” ■ In Shelly v. Nash, 3 Madd. R. 232, the same judge questions the principle and the policy of the rule, arguing to show that sellers of reversions were not necessarily in the power of those with whom they contract; and that persons who sell their rever *502 sions from the pressure of distress, are thrown by the ru^e ir1^0 ^le hands of those who are likely to take advantage of their situation; for no person can secure]y <jea| with them. Sir Wm. Grant, in Peacock v. Evans, 16 Ves. R. 512, says, that the tendency of this doctrine is to render all bargains with such persons very insecure, if not impracticable. And again, in Gowland v. De Faria, 17 Ves. R. 20, the same judge speaks of the rule requiring such a purchaser to show that a full and adequate consideration was paid as imposing a heavy burden upon him ; but that his"case is an exception to the general rule, that for mere inadequacy of value a contract is not to be set aside. In Jeremy’s Equ. Jurisdiction 398, the writer draws a distinction between contracts with expectant heirs, and contracts with the actual owner in remainder or reversion; and conceiving that contracts of the latter class are not necessarily of a nature to excite suspicion, he classes them with bargains to be set aside on account of fraud, and not merely on the ground of inadequacy of price.
The rule, therefore, if distinctly settled in England, as being applicable to contracts with reversioners who do not combine the character of expectant heirs, has only been so established within a recent period, and not without serious doubts as tp, its propriety. The authorities referred to show that it could not be regarded as a settled principle of equity jurisprudence at the date of American independence.
The subject was alluded to in the case of McKinney v. Pinckard, 2 Leigh 149. The case was, however, decided on other grounds ; the judge who delivered the opinion of the court, remarking that it was not necessary in that case to decide whether every seller of an expectant interest is to be treated as an expectant heir; *503 and therefore he gave no opinion on that point. The question has not been adverted to in any other case, and is therefore one of the first impression in Virginia.
There would seem to be no greater reason for restricting the right of the owner of a reversion or vested remainder than of property in his actual possession. A reversion is an interest of value. It has its market price; it may be subjected to the claims of creditors ; and the owner himself may make a valid sale at public auction, according to all the authorities. Yet, according to the doctrine of the recent English cases, every person entitled to such reversion or remainder is treated as an expectant heir, and in the language of Lord Thur-low in Gwynne v. Heaton, 1 Bro. C. C. 1, 9, “ There is a policy in justice, protecting the person who has the expectancy,’and reducing him to the situation of an infant, against the effects of his own conduct.” It becomes, therefore, important to enquire into the principle upon which this doctrine, as applied to reversions and vested remainders, is supposed to rest, and to ascertain how far the policy on which it is founded is applicable to the condition of this country. If the doctrine grows out of a policy hostile to our system of government, and incompatible with the habits of our people, there can be no propriety, when not controlled by binding authority, in our following the more recent English cases.
The case of Twistleton v. Griffith, 1 P. Wms. R. 310, contains the first enunciation of a policy which at length has prevailed in the English courts. In that instance a vendor thirty-four years of age, married and the father of a family, was the owner of a remainder in tail after his father’s death, who was old, and died two years after the sale. Lord Yorthington denied relief, yet upon a rehearing before Lord Jeffries, relief was granted ; the chancellor declaring such bargains tended to the destruction of heirs sent to town *504 for education, and to the destruction of families. That he saw no inconvenience in the objection, that at this an heir could not sell his reversion. This might force an beir g0 borne and submit to his father, or bite the bridle and endure some hardships; and in the mean time he might grow wiser and be reclaimed. This, which seems to be the leading case, wTas one in which the reversioner occupied the position of heir, his father the owner of the life estate, being regarded as the head of the family.
In the next case, Cole v. Gibbons, 3 P. Wms. R. 290, where the policy of the rule was expounded, the plaintiff claimed a reversion by a bequest of his uncle : Lord Talbot said the cases of heirs were not in point; and because no heir was concerned, and he afterwards confirmed the sale, relief was denied. But the chancellor said, that as to the cases of expectant heirs, it was the policy of the nation to prevent a growing mischief to ancient families, that of seducing the heir apparent from a dependence on his ancestor, who would probably have supported him, and by feeding his extravagancies, tempting him in his father’s lifetime, to sell the reversion of the estate which was settled upon him, for as much as it tended to the ruin of families.
Throughout the whole series of cases the policy announced in the two foregoing cases, of maintaining a due subordination to the head of the family and preventing the breaking up of family estates, seems to be the main foundation to the doctrine. Any person having a reversionary interest to dispose of, has, irrespective of his age, come to be classed with an expectant heir, and in the language of Lord Thurlow above quoted, reduced to the situation of an infant against the effect of his own conduct. This no doubt has arisen, in a great degree, from the situation of real property in England. Owing to their practice of strict *505 settlements and the laws of entail, the parent or ancestor is generally a life tenant, and the expectant heir, a reversioner. Thus combining both characters, courts for reasons of policy have applied principles adopted to protect the young and inexperienced expectant heir to the owners of reversions and remainders. The reasons of policy which have influenced the English courts, have but little application to this country. That due subordination to the head of the family upon which such stress is laid, and which the courts seek to enforce long after the heir has arrived at years of discretion, grows,out of the division of ranks which prevails in that country. The political and social pre-eminence of the governing class must be maintained ; and deference to the head of the family in all the relations of life, is one of the means by which a distinction of classes and gradation in society is kept up and preserved. The same consideration has operated to prevent the breaking up of estates. Titular rank, without wealth or position, soon ceases to command the respect of the community. To keep property in a particular line, restrictions are imposed upon the free alienation of real estate through the operation of their system of primogeniture, entails, and strict settlements; one of the consequences of which is to combine in almost every instance the character of reversioner with expectant heir; and hence the courts have assumed the extraordinary power to continue such reversioner in a state of pupilage long after he has arrived at years of discretion.
No such reasons exist for the recognition of such a doctrine here. The authority of the parent whilst the child is disabled to contract for himself, should be enforced by law; for the best security for the morality of the citizen is to be found by preserving unimpaired the family relations. But when legal control ceases the young man is called upon by the habits of our *506 people, and his duty to the public, to act for himself in all the most important relations of life, uninfluenced an abject deference to the opinions of others occupyjng no higher position in society than himself. Proper reverence is due at all times to the parent from the child; but when the latter has arrived at years of discretion, that respect becomes a moral obligation, which courts are not called upon to enforce. It will be more readily and cheerfully fulfilled when left to the free will of the child and the silent influence of a healthy public opinion, unaffected by legal restrictions upon his dominion over his property.
The policy of' our country favors the free alienation of property, is adverse to large accumulations descending in a particular line, and by abolishing entail and primogeniture, encourages an equal distribution amongst all standing in the same relation to the common ancestor. As one of the consequences of our system, it is rarely the case that the reversioner combines the character of expectant heir. Such combination, we have seen, is the rule in England, which has led the eourts to confound the reversioner with expectant heir, and to apply the same doctrine to both. In Virginia such combination is the exception. It is not often that the child under the control of the parent or ancestor, has a vested interest in his estate. Reversions usually arise after the death of the parent intestate, and most generally grow out of assignment of dower to the widow; and most remainders are created by the will of the parent making provision for his widow for life. A young man on attaining full age, frequently finds himself the actual owner of a vested remainder or reversion expectant on a life estate, and constituting the most valuable property belonging to him. A sale in such eases, in the dawn of manhood, for a moderate consideration, is most generally for the interest of the owner. Judiciously in *507 vested, or well improved in a country where the field for enterprise is so wide and inviting, it may lay the foundation of a fortune far exceeding the value of the whole fee simple when the life estate terminates.
By the English rule the owner of a reversion or vested remainder cannot derive benefit from his property by negotiating a private sale. He must either sell at public auction or hold on to the dry reversion until perhaps the decline of life. Unable to deal with it as with his other property, he is thrown into the hands of the speculator, who will indemnify himself for the hazard he runs in being called upon at some future day to show, by the vague opinion of witnesses, (whose testimony of former value will be insensibly influenced by the actual condition of things when they testify,) that the price was adequate at the time of the purchase.
Whatever principle may be adopted in reference to contracts with expectant heirs, secretly selling the chance of a parent’s or some relation’s bounty; it seems to me that the actual adult owner of a vested interest in property, whether in reversion or remainder, should not be reduced to the condition of pupil-age from regard to any supposed rule of public policy, or for the purpose of extending to him any particular protection. Ho such rule of public policy exists in this country; and all attempts to fetter the action of the owner by restricting his power of alienation, operate injuriously to him. They lessen competition, and so depreciate the market price of his property. There is no valid reason for making this an exceptional case. The contracts of such reversioners or remaindermen, like all other contracts, if made by those competent to contract, if they are not gained by ill practice, nor made against the laws, should be kept.
This court in several instances has repudiated the doctrine of imputing fraud as a matter of law. Davis *508 v. Turner, 4 Gratt. 422; Hutchison v. Kelly, 1 Rob. R. 123; Bank of Alexandria v. Patton, 1 Rob. R. 499. the enquiry in reference to sales by reversioners Qr remain(jermeQ} should be whether in the particular case actual fraud existed. Inadequacy of price, youth, inexperience, indebtedness, distress, are circumstances to be looked to and weighed in determining whether the bargain in the particular instance is not so unconscionable as to demonstrate some gross imposition, circumvention, or undue influence; and so to justify relief on the ground of fraud. In the absence of such proof of actual fraud, I do not think it is incumbent on the purchaser of such an expectant interest to make good the bargain, by showing that a full and adequate consideration was paid.
With respect to- the consideration in contracts of this kind; it was observed by Lord Hardwicke, in Nicols v. Gould, 2 Ves. sen. 422, “ That every purchase of this kind must be on the foot of great uncertainty as to the value.” And he asks, “ Will a court of equity, after the contingency has fallen out one way, enter into the consideration of the value ?” Or, as was said by the Chief Baron in Griffith v. Spratley, 1 Cox’s Cas. 383, “ The value of a thing is what it will produce, and it admits of no precise standard. One man may sell his property for less than another would. He may sell under the pressure of circumstances, which may make a smaller price more beneficial than a greater price would have been under different circumstances. If courts of equity were to unravel all these transactions, they would throw every thing into confusion, and set afloat the contracts of mankind.”
In the case under consideration, many of the witnesses deposed that in their opinion the price agreed to be paid was adequate. The testimony on both sides shows that about one thousand two hundred dollars *509 would have been the full market price for the whole fee simple, if sold upon the usual terms of credit. Deducting one-third, four hundred dollars, the value of the widow’s dower, and eight hundred dollars remain to be divided amongst the three heirs. A present interest of two hundred and sixty-six dollars and sixty-six and two-third cents to each, with a reversion in four hundred dollars, the one-third expectant on the widow’s life estate. This estimate, however, is made upon the market price of the property, supposing the whole fee simple could have been sold. But it was undivided, and from its nature probably not susceptible of equal division. The consent of the dowress would have been necessary to a sale of the whole, out and out. If she refused, and elected (as in all probability she would) to have her dower laid off, the assignment of dower in such a property would necessarily have materially impaired the market price of the residue. Under such circumstances, the value of the interest sold by the appellee is at best conjectural. And therefore we need not be surprised that many of the witnesses examined, looking to the mere money value of the interest sold, thought the price to be adequate. The most that can be said is, that perhaps at the time of the sale the price was a low one; and in the event which has happened, that the purchaser has made a good bargain. The inadequacy is very far from being so gross as to shock the moral sense; and it has uniformly been held, that inadequacy of consideration between persons who stand upon precisely an equal footing is in equity of no account,.unless from its grossness it is of itself evidence of fraud.
As to the allegation that the appellant has withheld a portion of the hand payment, it might constitute an objection to the specific execution of the contract at the suit of the appellant, if the same had not been executed; but in this case the contract has been exe *510 cuted by the conveyance. And besides, the retention a P°riion of the hand payment is satisfactorily accounted for. The proof shows that it was withheld t[-,e consent 0f the appellee until some enquiry COuld be made into the condition of the intestate’s estate.
Regarding the case as if the whole interest sold was reversionary, the most favorable aspect for the appellee under which it can be contemplated, he has, in my opinion, failed to make out a claim to relief either upon the law or the facts of the ease. In reality, however, the bulk of the property sold was a present interest in the undivided two-thirds. The reversionary interest embraced only the one-third to which the widow would be entitled for life. The doctrine of the English courts as to sales of reversionary interests did not apply to the most valuable portion of the property. Even if the English rule were recognized as obligatory,' it might still be questionable whether it should be extended to the purchase of such an interest, the larger portion of which was a present interest in the seller. But resting my judgment upon the broader ground before discussed, that the purchaser of such an expectant interest is not bound to show that the price given was adequate, when no fraud is imputed or proved, I do not deem it important to pursue this latter branch of the enquiry any farther.
I think the decree was erroneous, and should be reversed, and the bill dismissed. But as the case was one of the first impression, I think it should be dismissed without costs.
The other judges concurred in the results of the opinion of Allen, P.
Decree reversed.