PROVIDENT LIFE & TRUST CO. et al. v. FLETCHER et al.

(District Court, S. D. New York. November 1, 1916.)

No. E 10-111.

1. USURY ⊗═37—USURIOUS TRANSACTIONS—UNCERTAINTY AS TO REPAYMENT OF PRINCIPAL.
     As a general rule a transaction is not usurious, if the principal is put at any genuine hazard.
     [Ed. Note.—For other cases, see Usury, Cent. Dig. § 92; Dec. Dig. ⊗═37.]

2. USURY ⊗═37—USURIOUS TRANSACTIONS—PURCHASE OF CONTINGENT LEGACY.
     A transaction by which a legatee 44 years old, who had been refused life insurance by a number of companies as a bad risk, in consideration of money advanced him, assigned an interest in a legacy payable to him only in case he reached the age of 55 years, *held* not usurious.
     [Ed. Note.—For other cases, see Usury, Cent. Dig. § 92; Dec. Dig. ⊗═37.]

3. EQUITY ⊗═13—GROUNDS FOR EQUITABLE RELIEF—UNCONSCIONABLE CONTRACTS.
     In such case mere inadequacy of consideration is not sufficient to render the assignment invalid, and where the assignor had an income of $9,000 a year, and had previously made similar assignments of other legacies, which had matured, and had full understanding of the transaction, there is no ground upon which a court of equity should grant relief, as against an inequitable or unconscionable bargain.
     [Ed. Note.—For other cases, see Equity, Cent. Dig. § 26; Dec. Dig. ⊗═13.]

4. EXECUTORS AND ADMINISTRATORS ⊗═524(2)—RIGHT TO SUE IN FOREIGN JURISDICTION—FEDERAL COURTS—NEW YORK STATUTE.
     Foreign executors, who have filed the papers required by Code Civ. Proc. N. Y. § 1836a, may maintain a suit in a federal court in New York to recover assets of the estate.
     [Ed. Note.—For other cases, see Executors and Administrators, Cent. Dig. § 2334; Dec. Dig. ⊗═524(2).]

In Equity. Suit by the Provident Life & Trust Company and Catherine Stewart Wood, as executors of the will of William Brewster Wood, deceased, against Austin B. Fletcher, as testamentary trustee

⊗═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

of Conrad Morris Braker, under the will of Conrad Braker, Jr., deceased, and Conrad Morris Braker.   Decree for complainants.

This is a suit in equity to compel the defendant Austin B. Fletcher, as testamentary trustee under the last will and testament of Conrad Braker, Jr., to pay over to the plaintiffs $15,000, with interest from January 5, 1907, under the fifteenth and sixteenth paragraphs of the will of the said Braker.  The plaintiffs are the executors under the last will and testament of William Brewster Wood, deceased, of Philadelphia.  The defendants are the trustee above named and Conrad Morris Braker, the beneficiary under the said fifteenth and sixteenth items of the last will of Conrad Braker, Jr., by virtue of which trusts were created out of which the plaintiffs seek to be paid.  The jurisdiction of this court depends upon the fact of diversity of citizenship, and has been established by the Supreme Court, to which an appeal was taken on that point. The facts are as follows:

Conrad Braker, Jr., died on the 21st of July, 1890, leaving his wife, Frances J. Braker, and his next of kin, the defendant Conrad Morris Braker, a son, and another son, Henry J. Braker.  By his will he left various provisions in trust for his son Conrad Morris Braker, whom it is clear he already thought incapable of managing his own affairs, although at the time of his death the said Conrad Morris Braker was already 32 years old.  These provisions were as follows:

In the twelfth item of his will he bequeathed to the said Conrad Morris Braker the sum of $30,000, of which $5,000 was to be paid within 60 days after the testator's death, and the remaining $25,000 within 6 months thereafter. ·

In the thirteenth item of his will he settled a fund of $20,000 in trust upon his grandchild, Florence May Braker, and created a contingent remainder therein in favor of Conrad Morris Braker, in the event of the death of the said Florence May Braker before she reached the age of 21 years.  This provision never came into effect.

In the fourteenth item of his will he bequeathed to his son Henry J. Braker $50,000 in trust for Conrad Morris Braker, to pay him the interest thereon during his life, to pay $20,000 of the principal 10 years after his death, $20,000 15 years after his death, and the remaining $10,000 20 years thereafter.  These were contingent remainders.

By the fifteenth item of his will the testator bequeathed a further sum of $50,000 to Henry J. Braker in trust for Conrad Morris Braker, to pay the interest to him until he should reach the age of 55 years, when the same should be paid to him, and, in case of his death before, over to his wife, Florence, for life, and the remainder to the testator's grandchild.

In the sixteenth item of his will he bequeathed one-half of the residue of his total estate, after the bequests theretofore made for the benefit of Conrad Morris Braker, to his son Henry J. Braker, in trust for Conrad Morris Braker until he should reach the age of 55, at which time the trustee should pay over to him the whole amount, less $25,000, with which, at the age of 54, the trustee should purchase for him an annuity.

On the 25th day of February, 1902, Conrad Morris Braker executed an assignment in writing to the New York Finance Company, a New York corporation, of all his interest to the extent of $35,000 in the contingent remainder of $50,000 bequeathed him under the fifteenth item of his father's will, and in the contingent residuary remainder likewise bequeathed to him in the sixteenth item of the said will, subject to prior assignments to one Frank L. Rabe, which will be later mentioned.  The circumstances under which this transfer was made will also be set forth in detail later.

On July 5, 1912, the New York Finance Company executed its promissory note to William Brewster Wood, the plaintiff's testator, in the sum of $15,000, and on the same day therewith pledged, likewise by written assignment, as collateral security thereto, all their right arising by virtue of the assignment of Conrad Morris Braker of February 25, 1902, heretofore mentioned.  On May 14, 1912, the New York Finance Company executed a second agreement, this time to the executors of William Brewster Wood, who had died on the 24th day of April, 1905, reciting that there was due, upon the said note of $15,000, $19,725, and conveying to the said executors all their right, title, and

interest to the extent of $20,000 in the contingent remainder bequeathed to Conrad Morris Braker under the sixteenth item of the will of Conrad Braker, Jr. The assignment of Conrad Morris Braker to the New York Finance Company of the bequest under the sixteenth item of the will was not for $20,000, and that figure appears to have been reached because the transfer to Frank L. Rabe under the fifteenth item of the will conveyed $35,000 out of the total of $50,000, leaving the $15,000 applicable upon the $35,000 assigned by Braker's assignment to the New York Finance Company on February 25, 1902. This left $20,000 of such assignment to be borne by the bequest under the sixteenth item. The direct conveyance to the executors of Wood, therefore, is limited to the sixteenth item and to $20,000; for the balance they must claim as executors of a pledgee.

The assignment of Conrad Morris Braker to the New York Finance Company took place on the day mentioned in the document between one Cochran, an officer of the company, and Braker himself. Braker received only $2,150, for which he gave his receipt. He swears that he did not read the papers, and did not know what they contained, but that he supposed it was a simple loan, and that he could repay it when due. Depue, an officer of the company, swore that he read the papers to Braker before the day of execution, and the stenographer of the New York Finance Company swore that she had seen Braker reading them. Cochran, who closed the transaction, swore that on the day in question he handed the assignment and affidavit to Braker, who read them both over in his presence. The closing papers consisted of the assignment already mentioned, and of two affidavits, one executed by Florence Braker, Conrad Morris Braker's wife, and the other by Braker himself, which recited that he would be 44 years of age on the 25th day of February, 1902, that he had made certain assignments of his interests, under the will, but that except for such assignments the remainders were unincumbered. The affidavit of Florence Braker, which was executed on the 18th day of February, 1902, at Stamford, Conn., and which had been taken there for that purpose, recited that she was fully acquainted with the facts and that she knew of no sale other than those recited by Braker himself. In her deposition, Florence Braker swore that she signed the affidavit without reading it, but she said that Helfrich, who was an intermediary between Braker and the New York Finance Company, told her that, if her husband died before he reached 55, the company would have to lose the money; that that was a risk they would have to run, as they would get nothing. She also swore that Helfrich had told her that the transaction was a loan, which her husband could be rid of if he paid back the money he had received.

Braker, as part of the transaction here in question, had originally agreed to insure his life for the benefit of the New York Finance Company, and after application to four or five of the leading insurance companies he had been rejected as a bad risk, owing to a supposed affection of the kidneys. In view of this failure there were executed two additional papers at closing, an added assignment of $1,800 in place of the policy, and a collateral agreement for the release of this assignment, if within a year he should secure the policy of insurance above mentioned. He never procured the insurance, and the assignment, therefore, remains outstanding.

Conrad Morris Braker had made several prior transactions of the same or nearly the same character. On January 25, 1901, he borrowed of Mehry R. Loeb $5,000, payable on July 21, 1905, and assigned to him as collateral an interest to the extent of $20,000 under the fourteenth item of the will. On February 7, 1901, Loeb released to Conrad Morris Braker one-half of his interest under the fourteenth item of the will, and on February 11, 1901, Braker borrowed $2,500 from one William H. Sage, and assigned to Sage $8,000 of the one-half released by Loeb to Braker as aforesaid. On April 18, 1901, Braker assigned to Frank L. Rabe seven-tenths, or $35,000 of the bequest of the contingent remainder, $50,000, payable to him under the fifteenth item of the will on February 25, 1913. In this assignment there was a further provision that, if that bequest was insufficient, it should be made up under the sixteenth item of the will. For this Rabe paid him $3,500. On June 13, 1901, Braker assigned to Rabe all his remaining interest under the fourteenth item of the will, to wit, the remainder of $20,000, payable July 31, 1905, and $10,000

payable July 31, 1910, subject to the prior assignments of Loeb for $5,000 and to Sage of $8,000. For this Rabe paid him $2,500. These assignments to Rabe antedated the formation of the New York Finance Company, but were made by him in the interest of that company when formed, and were assigned to the company on October 1, 1901.

Braker, further to secure Sage and Loeb in their loans, took out three policies of insurance upon his life in the Penn Mutual Life Insurance Company, which he assigned to them as collateral, one of which went to Loeb and two to Sage. On the 18th of April, 1901, Braker assigned to Rabe any equity he might have in the Sage policies as added security for the advance of $3,500, and on the 13th of June, 1901, he assigned any equity which he might have in the Loeb policy as added security for the advance of $2,500. On April 23, 1901, Braker also took out two policies in the Equitable Life Insurance Company, of $7,500 each. These he assigned on April 24, 1901, to Rabe, as added security for the advance of that day.

On July 21, 1905, one remainder of $20,000 under the fourteenth item of the will fell in, and Braker was paid. He distributed this, $5,000 to Loeb, $8,000 to Sage, and $7,000 to Rabe. On that day there remained due under Rabe's assignment of April 18, 1901, $35,000 out of the remainders created by the fifteenth and sixteenth items of the will, and under Rabe's assignment of June 13, 1901, $10,000 out of the remainder created by the fourteenth item, which would fall due on July 21, 1910. By a suit in the Supreme Court of the State of New York between the New York Finance Company and Rabe, the assignment of June 13, 1901, was adjudicated usurious and void, and there remained due at the beginning of this suit, therefore, only the assignment in suit, and the assignment of April 18, 1901. Conrad Morris Braker became 55 years of age on February 25, 1913, and the legacies became payable under the fifteenth and sixteenth items of the will.

The trustee was made a party, and raises no question, except to the jurisdiction of the court and the absence of certain parties, so that the substantial controversy is between the executors of Wood on the one hand and Braker on the other.

Nathan A. Smyth and Peter B. Olney, Jr., both of New York City, for plaintiffs.

Safford A. Crummey and Alfred G. Reeves, both of New York City, for defendant Braker.

William P. S. Melvin, of New York City, for defendant trustee.

LEARNED HAND, District Judge (after stating the facts as above). There are two preliminary questions of fact which require solution: First, whether Braker understood the character of the transaction at the time of its execution; and, second, whether the New York Finance Company had recourse to any life insurance policies as security for the advances.

I have no hesitation in finding that Braker understood the character of the transaction. He was at that time 44 years old, and had been engaged with money lenders in four transactions within the year. His testimony is therefore not only inherently unlikely, but he is contradicted directly by Cochran, Depue, and Mrs. Jewell, and in effect by his wife, who says that Helfrich told her that, if her husband died before February 25, 1913, the company would lose its money, information inconsistent with the idea that it was an unconditional loan, as Braker now says. Furthermore, neither side dared call Helfrich, a consideration counting against the defendant rather than the plaintiffs, because it rests upon him to show that the transaction was not what the documents make it appear. The burden of proof in such cases

rests upon those who would show it as of a different character from what is written.

I think it clear that the life insurance policies should not be taken as applicable to the transaction of February 25, 1902, and yet it is only if they were so intended that they may be considered upon the question of usury. The parties meant Rabe to recover the whole face of the assignments of April 18 and June 13, 1901; they had no intention of regarding them as security for the advances. It is precisely on that account that one of them has already been held to be usurious, and that the other may be so held; at least, it has been challenged. If Braker were to die, the assignments became due; it was likewise the purpose of the parties, not that the policies should be security for a loan, but that Rabe should have the whole of them. At least, that is the way in which the documents read, and there is nothing to contradict them. The parties intended the transactions to take place just as they were written, and could not, therefore, have intended the policies to be available upon the transaction of February 25, 1902. It is irrelevant that they *might* have used the overplus of the policies to secure the repayment of February 25, 1902, if they had regarded the Rabe advances as loans, because they did not consider that they were loans at all. On February 25, 1902, they also tried to get a policy, and they would have affected the whole transaction with usury if they had succeeded; but their effort shows that they did not regard the existing policies as available upon this transaction. Moreover, even if they had intended the policies to stand as security for the transaction at bar, their intent would have been ineffectual, because the Rabe transactions were void for usury, and with them fell the policies. I do not, indeed, think that the fact of these policies' being void affects the situation, which must be controlled by the intent of the parties on February 25, 1902; but the argument was made that intent was not the measure, and it is a perfect answer that the policies *could* not be added security, because, being usurious, they were available for no purpose.

[1, 2] These questions of fact being disposed of, the first question of law which arises is whether the transaction, without the security of any life insurance policies, was usurious. In Rex v. Drury, 2 Lev. 7, Lord Hale seems to have thought that the obligor must be bound to pay the principal in order to constitute usury; but such is certainly not the law, and that case was disapproved in Scott v. Lloyd, 9 Pet. 418, 447, 9 L. Ed. 178. The general test is whether the principal is put at any genuine hazard. Chesterfield v. Janssen, 2 Vesey, 125; Tyson v. Rickard, 3 Har. & J. (Md.) 109, 5 Am. Dec. 424; Colton v. Dunham, 2 Paige (N. Y.) 267. A number of cases have come up in the state of New York similar to that at bar, and, indeed, some of them transactions of the New York Finance Company. They have generally been held usurious, but in all cases which I have been able to find they have been so held because, under all the possible circumstances, the principal must be repaid. Wetzlar v. Wood, 143 App. Div. 311, 128 N. Y. Supp. 50; Id., 154 App. Div. 890, 138 N. Y. Supp. 1148; Id., 214 N. Y. 639, 108 N. E. 1111; Hall v. Eagle Ins. Co., 151 App. Div. 815, 136 N. Y. Supp. 774, affirmed 211 N. Y. 507, 105 N.

E. 1085; Hartley v. Eagle Ins. Co., 167 App. Div. 230, 152 N. Y. Supp. 686; Merc. Ins. Co. v. Gimbernat, 134 App. Div. 410, 119 N. Y. Supp. 130; Otten v. Freund, 150 App. Div. 434, 135 N. Y. Supp. 59; Braker v. N. Y. Fin. Co., 155 App. Div. 894, 139 N. Y. Supp. 1117; Id., 214 N. Y. 683, 108 N. E. 1090. In all these cases, either in one way or another, the payment of principal was secured beyond any but colorable hazard. Now it is quite clear that in the case at bar the parties started out, as I have said, upon a usurious transaction, and if Braker had been able to secure a policy of life insurance nothing could be said for its validity, because the principal would have been secured under all contingencies. But he was unable to get any insurance policy, and the necessary result, whatever the original purpose, was to imperil the principal, not upon a mere colorable hazard, but upon a genuine one. At that time he was 44 years old, and had been refused by at least four insurance companies as an undesirable risk, on account of his kidneys. The question whether he would live 11 years or not was a genuine hazard of the most real sort, which cannot be disguised by the fact that he has in fact lived out the time. Whatever other illegality the transaction may have, it was certainly not usurious.

[3] · The second question of law is whether the case is one of those "catching bargains" against which a court of equity will relieve. The jurisdiction is among the oldest of the Court of Chancery (Aylesford v. Morris, L. R. 8 Ch. App. 484, 489), and is certainly connected with the preservation of family property (Twistleton v. Griffith, 1 P. Wms. 310), and the importance of protecting wealthy young heirs from ruining a patrimony before they feel the force of family traditions. It has never been defined with much clearness, for the language of Lord Hardwicke in Chesterfield v. Janssen, 2 Ves. Sr. 125, 155, 156, which seems to have been regarded as the best statement of the doctrine, does not, with deference, define anything at all beyond saying that there are circumstances short of deceit in which the court will regard one of the parties as at a relative disadvantage to the other. Until 1867 mere "inadequacy of consideration" was undoubtedly enough in England. Earl of Aldborough v. Trye, 7 Cl. & F. 436, 456; St. Albyn v. Harding, 27 Beav. 11; Foster v. Roberts, 29 Beav. 467. But the situation proved intolerable, and in that year by 31 Vict. c. 4, it was provided that such inadequacy alone should not upset the bargain.

In this country it is uncertain just what is the true rule. In Pennsylvania the law was early settled as the statute of Victoria settled it in England in 1867. Davidson v. Little, 22 Pa. 245, 60 Am. Dec. 81; Re Jackson, 203 Pa. 33, 52 Atl. 125; Re Phillip, 205 Pa. 511, 55 Atl. 212. The same is true in Virginia. Cribbens v. Markwood, 13 Grat. (Va.) 495, 67 Am. Dec. 775 (an excellent discussion); Mayo v. Carrington, 19 Grat. (Va.) 74, 107. In two early cases, one in New York (Osgood v. Franklin, 2 Johns. Ch. 1, 25, 7 Am. Dec. 513), and the other in South Carolina (Butler v. Haskell, 4 Desaus. 651, 697), language was used which certainly recognized the English rule, though it was not necessary to the decision. In Illinois the cases do not decide the point (Parsons v. Ely, 45 Ill. 232, Gary v. Newton, 201 Ill. 170, 66

N. E. 267; Hudson v. Hudson, 222 Ill. 527, 78 N. E. 917), but leave it likely that inadequacy of consideration is not enough. In Massachusetts an early case certainly looks the other way, but nothing is decided. Trull v. Eastman, 3 Metc. 121, 37 Am. Dec. 126.

I accept the Pennsylvania and Virginia rule as more appropriate to our modern society. We have no public concern for the preservation of family inheritances, and ought, I believe, have no tenderness towards expectants of rich reversions. It may be that the purchase of a remainder carries with it the burden of showing that there was no exploitation of extreme need, no beguiling of youthful heirs, and even that the ancestor consented, when there is one—a doctrine very strange in American ears (Curtis v. Curtis, 40 Maine, 24, 63 Am. Dec. 651; Hale v. Hollon, 90 Tex. 427, 39 S. W. 287, 36 L. R. A. 75, 59 Am. St. Rep. 819; Boynton v. Hubbard, 7 Mass. 112); but I cannot believe that, in addition, it must be shown that the consideration was what the court may think adequate. Once the parties are shown capable of dealing with each other, I can see no possible reason for refusing them the right to make their own bargain. Even allowing that youth or poverty in such circumstances create an incapacity to contract, there is certainly no valid reason in America for preventing the sale of expectancies. If it be not so, we shall find it necessary to permit it by statute, as was done in England, for the supposed protection to such persons foils itself; they become incapable of selling when they need to sell.

I have hitherto assumed that the consideration here was inadequate, and perhaps it was; at least, the purchaser cannot show that it was not. Yet the matter is surely open to doubt, for, although the remainder was ten times, or nearly, the principal with interest to February 25, 1913, the hazard was wholly unknown and unascertainable. Actuarial tables are founded upon average lives, and Braker's was not such. His rejection by so many insurance companies proves that the hazard was not calculable, and it is quite impossible to fix the proper odds upon any basis but a guess. At least, we must concede that the consideration may have been adequate, though, were I to guess, I should say that it was not.

Except for that element, there is certainly no ground for interposing. Braker was 44 years old, and had had earlier experience in such matters. Even if the tutelage of his father would not have been preposterous under the circumstances, his father was dead; he was not an expectant heir, but a remainderman on his own estate for life. He had the assistance of Helfrich, an ambiguous intermediary, to be sure, but at least not shown to be of the lender's party. Most important of all, he was already affluent; his income of $9,000 a year not only provided for his necessities, but gave him much greater wealth than of 99 men out of 100. I find it hard to have patience with the waterish sentiment which seeks to make such a man the court's ward, and to protect him against the consequences of his own folly. If he is to have the enjoyment of great wealth, let him share its responsibility. If the prospect of a dollar so teased his appetite that the future ceased to be a reality, either let him be regarded as an incompe-

tent and put in ward, or let us treat him as a person in a world of persons, and let him weave his fate as he will. Whatever our judgment of those who profit by the imbecilities of their fellows, their punishment should not, as I think, be through the repudiation of a promise made under such circumstances. A hard bargain with a hard-pressed man is one thing; we do not allow a workman to barter away his protection from injury. But a hard bargain with a well-furnished spendthrift is another; I can see no social purpose in giving such a one an immunity which the community at large does not enjoy.

[4] The next question is of the plaintiffs' capacity to sue. The assignment of 1912 was clearly sufficient to pass any interest in the sixteenth item, for it was made to them as executors, and they did not take it by operation of law. However, it is quite likely that the remainder under this item will not be enough for the full debt, so that the question arises of their capacity to sue for the remainder created under the fifteenth item. They have filed the papers requisite under section 1836a of the New York Code to enable a foreign executor to sue in a New York court. The question is whether that statute should be held to cover a cause originally brought in a federal court. Had it been removed from the state court, Hayes v. Pratt, 147 U. S. 557, 13 Sup. Ct. 503, 37 L. Ed. 279, would control; but it was not. Section 1836a in form applies only to the state courts, and a literal interpretation of it would prevent its use in such a case as this, yet I am disposed to interpret it as meaning that the state of New York recognizes, under the conditions specified, the right of foreign executors to collect by process of law the property of their decedent within the state, a matter over which the state of New York has entire control. Such executors may come into a federal court, it is true, only under the terms of an act of Congress; but, if the substantive right is given them, the acts of Congress are sufficient. Their incapacity is not procedural, but because administration is in rem, and the law of the territory where the res is situated, may recognize any one as a proper representative of the decedent. I cannot believe that the purpose of section 1836a was to recognize the foreign executor as such a proper representative only when he sued in a state court. Lecouturier v. Ickelheimer (D. C.) 205 Fed. 683.

The last question is of the supposed prior conveyance by the New York Finance Company to Banes. At the trial I said that, if the trustee continued to press the point that the plaintiffs' title was affected by these conveyances, the matter would have to come up again, because it was not clear to me just what the situation was in that regard. If that matter, which certainly can be cleared up, is not pressed, the plaintiffs may take a decree as prayed, with costs, without further delay.