Westchester Mortgage Co.  
vs.  Eq. No. 2082.  
Newport Trust Company

January 2, 1929.

BLODGETT, J. Heard upon bill, answer and issues of fact.

Frances M. Hoyt died in Newport in 1905 leaving a will duly probated in Newport. The fifth clause of said will created a trust fund consisting of certain securities, the income of which was to be paid to Mrs. John K. Van Rensselaer during her life, and the principal, after her death, to be given absolutely to her son John A. Van Rensselaer. The Newport Trust Co. was duly appointed trustee to succeed the trustee named in the will. May 28, 1906, John A. Van Rensselaer executed the following note:

Newport, R. I., May 28, 1906.  
$14,000

One year after date, for value received, I promise to pay James J. Phelan, or order, Fourteen Thousand no/100 Dollars, with interest thereon at the rate of ten per cent. per annum, payable quarterly, in advance, until said principal sum is paid, whether at or after maturity, all installments of interest in arrears

to' bear interest at the rate aforesaid until paid. Payable at Newport Trust Company, Newport, R. I.

John A. Van Rensselaer.

At the same time Van Rensselaer executed an agreement assigning to said Phelan the securities in the hands of the Newport Trust Co. On its face it was absolute but was accompanied by an instrument in the nature of a defeasance agreement declaring said assignment to have been made as collateral security for said note. Interest was paid on said note to September 10, 1907, as follows:

| | |
|---|---|
| May 28, 1906 | $350.00 |
| Aug. 28, 1906 | 350.00 |
| Nov. 28, 1906 | 350.00 |
| Feb. 28, 1907 | 350.00 |
| May 28, 1907 | 350.00 |
| Sep. 15, 1907 | 50.00 |

A total of ..............$1800.00

Since September 15, 1907, no payments have been made either for interest or upon the principal.

James K. Phelan died in 1908.

December 12, 1924, the executors of Phelan transferred to the Westchester Mortgage Co., the complainant in this bill. the note in question and the assignment of the securities in the hands of the Newport Trust Co. The Westchester Mortgage Co. demanded from the trustee the securities in its hands, after the death of Mrs. John A. Van Rensselaer, and upon its refusal brought the present bill in equity to obtain said securities.

The Newport Trust Co. filed an answer to said bill in the nature of a bill of interpleader, setting forth certain assignments of said John K. Van Rensselaer, subsequent to the Phelan assignment, to secure certain notes, made to one George B. Hurd for $3,000 and running at six per cent. simple interest, from June 2, 1908, and to one H. Van Rensselaer Kennedy for $5,000 and running at simple interest of six per cent. from November 10, 1908; that

both Hurd and Kennedy are deceased: that the Hurd interests are represented by his executors, Florence H. Hurd, Frank B. Hurd and Frank H. Hurd: that the Kennedy interests are represented by his executors, J. Mahew Wainwright and Marian Robbins; that Katherine Van Rensselaer is executrix of the will of John K. Van Rensselaer, deceased; all of whom are joined as parties respondent in said bill and answer. The answer prays for determination of the liens of the several parties complainant and respondents in and upon the trust fund in its hands

The stipulated issues are:

1. Was the note, assignment or agreement dated May 28, 1906, between John A. Van Rensselaer and James J. Phelan, (a) Usurious; or (b) Oppressive; or (c) Extortionate; or (d) Unreasonable; or (e) Unconscionable; or (f) Deceptive; or (g) Contrary to Public policy?

2. Has the Westchester Mortgage Co. a lien upon the trust estate of Frances M. Hoyt, by reason of said note, assignment and agreement, and if so, to what extent?

The Hurd and Kennedy respondents are holders of assignments subsequent to the Phelan assignment, and the Van Rensselaer respondent is the owner of the final equity remaining after payment of the three prior assignments. No question arises with regard to these claims after the amount due the Westchester Mortgage Co. has been determined.

The respondents claim that these issues have been litigated in the New York courts in the case of Westchester Mortgage Co. vs. Grand Rapids & Ionia Railroad Co. et als. and decided in favor of respondents.

The judgment in the above case was pleaded by the respondents to the present bill, and upon a hearing before Mr. Justice Hahn in this court it was held that this judgment was not a bar to the present bill.

Respondents further hold that even if the New York judgments of law and fact are not conclusive, yet they are persuasive and should be followed unless manifestly wrong.

Respondents further hold that the testimony of John K. Van Rensselaer (now deceased), and other evidence plainly show the said note and agreement to be unconscionable and deceptive, and that the complainant is only entitled to a lien upon the trust fund for the principal of said note and interest after maturity at six per cent.

In view of the findings of Mr. Justice Hahn upon the plea in bar, the Court determines that the judgments of the New York courts are not binding upon this court as res adjudicata.

It is apparent that the loan was made by Phelan on the security of Van Rensselaer's inheritance, as a vested estate in remainder. Sec. 953 Pomeroy's Equity Jurisprudence says:

"Expectant heirs, reversioners, and holders of other expectant interests stand in a position different from that of all other persons sui juris, and a special jurisdiction for their protection has long been well established. This jurisdiction rests upon two distinct foundations. In the first place, heirs, reversioners, and other expectants, during the lifetime of their ancestors and life tenants, are considered as peculiarly liable to imposition, and exposed to the temptation and danger of sacrificing their future interests, in order to meet their present wants. Being sometimes in actual, but more often in imaginary, distress, they do not stand upon an equal footing with those who deal with them concerning their expectant estates, and such persons are in a position to take advantage of their condition, and to dictate inequitable and even extravagantly hard terms in any contract of loan or purchase which may be made. In the second place, the dealings of heirs and reversioners with their expectant interests are often a gross violation of the moral if not legal duties which they owe to their ancestors and life tenants who are the present owners of the property, and from or through whom their future estates will come, and may be a virtual fraud upon the rights of those parties. * * * But in every such conveyance or contract with an heir, reversioner, or expectant, a presumption of invalidity arises from the transaction itself, and the burden of proof rests upon the purchaser or other party claiming the benefit of the contract to show affirmatively its perfect fairness, and that a full and adequate consideration was paid,— that is, the fair market value of the property, and not necessarily the value as shown by the lifetables. * * * It is not necessary to show as a condition of relief that the heir or reversioner was an infant, or that he was in a condition of actual distress when the bargain was made. A court of equity presumes distress. The very fact of the sale or charge shows prima facie that he was not in a position to make his own terms, and that he submitted to have them dictated to him by the other party. The foregoing rules assume, simply, that there was an inadequacy of consideration without any further element of fraud. If, in addition, the circumstances show actual fraud, misrepresentations, or concealments, oppression, taking undue advantage of real necessities, or other unfair, inequitable dealing by the party who acquires the expectant interest, a court of equity will grant full relief without regard to any presumption."

These principles are followed in a long line of cases cited.

The American cases do not go so far as the English in granting relief to the assignor of an expectant estate, but it has been held that the purchase of a

remainder carries with it the burden of showing that there was "no exploitation of extreme need."

*Provident Life & Trust Co.* vs. *Fletcher*, 237 Fed. 104,110.

It is evident that a note requiring ten per cent. interest payable quarterly in advance would grow as stated in *Brown* vs. *Hall*, 14 R. I. 249, where at page 252 the Court says:

"Such a note grows like a banyan tree, generating a new stem every (quarter) until it becomes an interest bearing forest, incessantly multiplying and accumulating its increments."

Under complainant's contention the Phelan loan of $14,000 in 1908 would now amount to about $72,000, while the Hurd and Kennedy loans in the same period would be simply doubled at simple interest.

There is testimony on the part of Van Rensselaer in the New York action relative to the circumstances surrounding the making of a loan as follows:

His first conversation with Mr. Shipman was in April, 1906 (Rec. p. 337, fol. 1010).

He met Mr. Shipman at his office (Rec. p. 338, fol. 1012).

He went to Rhode Island at Mr. Shipman's request (Rec. p. 342, fol. 1024).

He met Mr. Shipman at Mr. Gardner's office at Mr. Shipman's request (Rec. p. 342, fol. 1025).

Mr. Gardner was a lawyer and Mr. Van Rensselaer had never seen him before. Mr. Shipman was never Mr. Van Rensselaer's attorney (Rec. p. 342, fols. 1025, 1026).

Mr. Van Rensselaer went from Providence to Newport in the company of Mr. Shipman and Mr. Gardner (Rec. p. 343, fol. 1028).

He told Mr. Shipman he was going to get married and wanted some money (Rec. p. 344, fol. 1031).

Mr. Shipman was Mr. Phelan's attorney (Rec. pp. 348, 349, fols. 1044. 1045).

Mr. Gardner represented Mr. Shipman (Rec. p. 444, fols. 1331, 1332). The foregoing facts are also confirmed by the testimony of Mr. Rathbone Gardner in his deposition taken in the New York action. He testified that Mr. Van Rensselaer had no other attorney (Rec. p. 456, fol. 1386).

In *Bowen* vs. *Wolff*, 23 R. I. 56, the only attorney employed was the attorney for the lessee, and in a suit to reform the lease, the Court said at page 58:

"While no actual fraud is charged, and while we have no doubt that the lease was fully read to her by the attorney before whom it was executed, it is evident that she did not comprehend what she was doing, and that advantage was taken by the respondent in this respect."

And at page 59 the Court said:

"We cannot think that the complainant would have signed such a lease if she had comprehended it, or had taken independent advice. * * In this case we think that the contract was unconscionable, the result of importunity and impulsive action. based upon confidence reposed in the respondent, who treated with the complainant on unequal terms."

And at page 60 the Court said:

"It was his duty to give him full and true information and to be sure that he understood the contract. Such a rule of duty applies with equal force to one acting as a friend, and with far greater force to a treaty with one, who, not a member of the bar * * *."

Mr. Gardner further testified as follows:

"Q. What was the nature of the transaction to which you refer, and your connection with it?

A. I was employed by the firm of Blandy, Mooney & Shipman, of New

York, to co-operate with them in the proceedings relative to the making of a loan by Mr. Phelan to Mr. Van Rensselaer.

Q. Which party to the transaction were you representing, Mr. Gardner?

A. I was acting under instructions from Blandy, Mooney & Shipman, who were the attorneys, as I understood, for Mr. Phelan.

Q. About when were you retained in the matter?

A. I shall have to refer to correspondence.

Q. You don't remember that of your own memory?

A. No.

Q. Can you refresh your recollection from that correspondence I hand you?

A. Yes; I was retained in this matter about April 1st, 1906.

Q. April 1st, 1906; and after you were retained, what did you do?

A. I made an examination of the questions of law involved.

Q. Do you remember what those questions of law were, Mr. Gardner?

A. Chiefly as to the usury laws of the State of Rhode Island—as to whether a note bearing 10% interest would be valid under Rhode Island law.

Q. What did you do thereafter, Mr. Gardner, in connection with this matter?

A. I then considered the best method to be followed in carrying out the transaction, making the loan, and having it properly secured.

Q. Did you prepare any papers in connection with the matter?

A. I did.

Q. What did you do with the papers which you prepared?

A. I sent them to Blandy, Mooney & Shipman.

Q. What next happened, Mr. Gardner?

A. There was correspondence between us, that is, between Blandy, Mooney & Shipman and myself, with reference to certain features of the papers which I had prepared, and certain amendments were made—changes were made—until ultimately, I sent them a draft of the different instruments which met their approval. Subsequently, on May 28, 1906, Mr. Shipman and Mr. Van Rensselaer came to my office in Providence, bringing the papers with them and we all three went to Newport where the papers were delivered and the transaction completed."

See also Rec. p. 457, fols. 1369-1370, at which point Mr. Gardner testified as follows:

"Q. Well, the giving of money was just as important an element and part of the transaction as Exhibit A was, was it not?

A. The giving of money was not under my control and inspection in any way. It was employed to prepare certain papers and I did so, and then went down with the parties to attend their execution. I didn't see any money handed, to the best of my recollection."

See also Rec. 459, fols. 1376, 1377, where Mr. Gardner testified as follows:

"Q. Then, wasn't it just as important a feature under the laws of Rhode Island that Mr. Van Rensselaer should receive the consideration mentioned in the papers to make the papers valid?

A. That was not a Rhode Island matter at all—a simple matter of fact that would have been equally important whether in Rhode Island or in New York. The matter which would defeat the purpose and intention of the parties for whom I acted would be the delivery of this note in New York, where it would be a usurious instrument, and it was part of my duty, as I conceived it, to see that it was delivered in Rhode Island.

I therefore think it probable that I did; that is all."

See also Rec. p. 474, fols. 1421, 1422, where Mr. Gardner recited as follows:

"Q. What did you go to Newport for?

A. What did I go for?

Q. Yes.

A. To introduce Mr. Shipman chiefly, and vouch for him with the people in Newport, and to do what I could in advising as to any matters which might arise in connection with the carrying through of the transaction."

It also appears from the testimony of Mr. Van Rensselaer that Mr. Gardner had never seen Mr. Van Rensselaer before. See Rec. p. 351, fol. 1051:

"Q. You know Mr. Rathbone Gardner—you met him that day?

A. I met him that day for the first time."

Mr. Gardner testified as follows:

"Q. Did you at that time know anything about whether Mr. Van Rensselaer was a man of means?

A. I don't think I knew anything about it. He impressed me as a man who was pretty hard up, if he was of any means." (Rec. pp. 473-474. fols. 1419-1920).

A necessitous borrower is always particularly subject to the protection of the courts.

*Brown* vs. *Hall*. 14 R. I. page 251:

"We think it may be further said that negotiations for loans are watched by the courts with a special scrutiny, because the necessitous borrower is so often at the mercy of the extortionate and relentless lender."

In Pomeroy's Equity Jurisprudence, Sec. 948, it is said:

"Persons in Vinculis.—Analagous to the condition of mental weakness is that of pecuniary or other necessity and distress. Whenever one person is in the power of another, so that a free exercise of his judgment and will would be impossible, or even difficult,

and whenever a person is in pecuniary necessity and distress, so that he would be likely to make any undue sacrifice, and advantage is taken of such condition to obtain from him a conveyance or contract which is unfair, made upon an inadequate consideration, and the like, even though there be no actual duress or threats. equity may relieve defensively or affirmatively."

In 13 Corpus Juris, 409, the rule is stated as follows:

"Necessity and Distress. Where one party has taken advantage of another's necessities and distress to obtain an unfair advantage over him, and the latter, owing to his condition, has encumbered himself with a heavy liability or an onerous obligation for the sake of a small or inadequate present gain, equity will relieve him. So agreements between lender and borrower are closely scrutinized because they are not always at arm's length."

In 41 Corpus Juris, 472, it is stated as follows:

"Excessive or unfair interest. Aside from the question of usury, courts of equity will not permit a creditor to collect interest on his mortgage debt, at the full rate stipulated for, where rate is so excessive and unfair as to show that it was obtained by undue influence or by taking an unconscionable advantage of the inexperience, improvidence, or necessities of the debtor."

As to the purpose of the visit to Rhode Island Van Rensselaer testified:

"Q. And for what purpose did you go to Newport?

A. Down to the trust company.

Q. What trust company?

A. Newport Trust Company.

Q. For what purpose did they ask you to go there?

A. For the purpose of identification.

Q. Who told you that?

A. Mr. Shipman."

Rec. p. 343, fols. 1028, 1029:

"Q. Don't you recall whether they went in and arranged for checks?

A. I didn't know what they did. I stayed around there and waited for the completion of the transaction. They wanted me to identify myself to the trust company. I went there for that purpose." (Rec. p. 354, fol. 1061.)

Complainant claims it is entitled to interest upon interest, compounded quarterly, forming a new principal every three months.

>*Sessions* vs. *Richmond*, 1 R. I. 298;
>*Brown* vs. *Hall*, 14 R. I. 249.

In Wheaton vs. Pike, 9 R. I. 132 (1868), which was an action at law in assumpsit, the Court said at page 136:

"We adopt the rule allowing interest upon instalments of interest, overdue and remaining unpaid. '

"We think, however, that upon principle where, at least, the note is like the one here in suit, the rule does not properly extend to interest accruing after the principal has matured. After that, both the accruing interest and the principal are due, not on a particular day, but every day, until they are paid. The amount of the judgment in this case, therefore should be the amount of the principal of the note, with simple interest thereon to the present day; and also the amount of the semi-annual dues of interest, including that which accrued when the note became due, with simple interest thereon to the present day."

In Lanahan vs. Ward, 10 R. I. 299 (1872), there was a suit to foreclose a mortgage given to secure a bond to pay $7,500 on or before May 7, 1859, "with interest from date at and after the rate of seven per cent. per annum, payable the 7th day of May, 1858, and after that time semi-annually until the principal sum of $7,500 be paid."

The master decided that interest was due semi-annually for the whole time and reckoned it up to the date of his report, allowing as damages six per cent. interest (the legal rate in Rhode Island) on these instalments. The court held, however, that the plaintiff was not entitled to interest upon interest after maturity in spite of the use of the words "until paid." The court said at page 301:

"In the case of Wheaton vs. Pike, 9 R. I. 132, this court allowed instalments to be stated in reckoning interest, and interest on these instalments up to the time the principal was due. On the amount so ascertained to be thereon due, simple interest thenceforward.

"We do not feel justified in going farther in the present case. The objections to a different course, as stated in the opinion in the former case, are strong, and it is difficult to see how they can be obviated. It is claimed that the words 'until paid' distinguish this case from the former one. We can, however, give effect to these words by applying them to the rate of interest. * * * "We therefore should so far sustain the exceptions as to direct seven per cent. instalments to be reckoned with interest on them up to the time when the principal was due, and seven per cent. simple interest on the amount then due, from thence until the present time."

It seems somewhat uncertain from the testimony whether the instruments prepared by Gardner and sent to New York were executed there or in Newport, but the delivery was in Newport. No money passed at this time. In New York Van Rensselaer received two checks, one for $1550, the other for $12,450. Van Rensselaer indorsed the $1550 check to Shipman. Shipman. from this money, paid the first quarterly interest on the loan, the $50 borrowed by Van Rensselaer to pay his expenses to Rhode Island, and appar-

ently retained the balance either as a broker's commission or for his own services and for his associate, Gardner. It is clear from the record that Van Rensselaer paid Phelan's attorney. It is also clear that he was hard up when he was compelled to borrow $50 to pay his expenses. It is also clear that he was anxious to get married and there is no testimony that he had any means to support a wife save the expectancy created by the trust. He was in a situation where he needed sound advice and in so far as appears from the record was not represented by counsel at any stage of the proceedings which lasted from April 6, 1906, to May 28, 1906. There is nothing in the record to evidence any business perspicacity on his part, or that any suggestion was made to him by either Shipman or Gardner that he should give serious thought to the matter before tying himself up in such a hard contract which in the course of years would eat up his estate like a cancer. There is no evidence that any effort was ever made by Phelan or his executors to obtain judgment upon this note after maturity. They allowed any claim they might have by reason of the contract to sleep from 1908 to 1924. This conduct might well lead Van Rensselaer to sleep upon any rights he might have to have the contract set aside. The Westchester Mortgage Co. purchased the $14,000 contract for $8,500, long after maturity, with knowledge that nothing had been paid upon the same for sixteen years, and of course took the same subject to any equities existing between Phelan and Van Rensselaer.

While the judgments of the New York courts upon this same testimony are not binding upon this court, yet they have great persuasive force and in the judgment of this court are manifestly just and equitable.

This court, therefore, determines that the contract entered into between Van Rensselaer ad Phelan was unconscionable and oppressive;

And that the Westchester Mortgage Co. has a first lien upon the securities in the hands of the Newport Trust Company for fourteen thousand dollars and simple interest upon the same at the rate of six per cent. per annum from September 10, 1907;

And that the Hurd interests have a lien upon the said trust fund for $3000 and simple interest at six per cent. per annum from June 2, 1908;

And that the Kennedy interests have a lien upon said trust fund for $5000 and simple interest upon the same from November 10, 1908, at the rate of six per cent. per annum.

And that the widow is entitled to any balance remaining of said trust fund after the payment of costs and expenses, and such commission for services as said trustee is entitled to.

A decree may be entered accordingly.

For complainant: Moore & Curry.

For respondent: Burdick & MacLeod, Hinckley, Allen, Tillinghast & Phillips.