[No. 5753. Decided December 13, 1905.]

MARTHA I. LANDIS, *Appellant,* v. J. A. WINTERMUTE, *Respondent.*[1]

ATTORNEY AND CLIENT — TRANSACTIONS BETWEEN — GOOD FAITH. Where a sale of mining stock from an attorney to an inexperienced woman grew out of transactions in which he represented her as an attorney and in a confidential relation, whereby he gained her confidence, he is bound to use the utmost good faith, the burden of proving which will be upon him; and the sale should be rescinded if material matters were misrepresented.

SALES — RESCISSION — FRAUD—TRANSACTIONS BETWEEN ATTORNEY AND CLIENT. A sale of mining stock by an attorney to his client, an old lady inexperienced in business matters, for whom he had been transacting business, should be cancelled for fraud, where the client testified that he represented it as a sale by the company, in which he had no interest, and that a monthly dividend equal to ten per cent per annum would be paid thereon, while the fact was that he sold her his own stock at one dollar per share, when its highest selling price was fifty cents per share, and advanced the monthly dividend himself, the company never having paid any dividends, and where her testimony is strongly corroborated by a letter written by the attorney describing the transaction as testified to by her.

SAME—LACHES—WAIVER OF RESCISSION. In such a case the client is not estopped by neglecting to rescind the sale upon being informed that the stock sold for fifty cents a share, when she thereupon asked the attorney to show her his stock, and her suspicions were allayed by seeing printed thereon the words "shares $1 each," and by other matters.

SAME — ESTOPPEL — VOTING STOCK AFTER ATTEMPTED RESCISSION. A person to whom mining stock has been fraudulently sold, and who has sought a rescission of the sale, tendering back the stock, is not estopped to insist upon a rescission by the fact that she attended a stockholders meeting and voted the stock after the commencement of the action.

[1] Reported in 82 Pac. 1000.

Appeal from a judgment of the superior court for Pierce county, Huston, J., entered April 18, 1905, upon findings in favor of the defendant, after a trial on the merits before the court without a jury, in an action for the rescission of a sale of mining stock.  Reversed.

*John M. Boyle* and *Roberts & Leehey,* for appellant.
*John A. Shackleford* and *A. H. Denman,* for respondent.

Root, J.—Appellant came to Tacoma from Pennsylvania in May, 1901, being then about sixty-six years of age, and being nearly seventy at the·time of the trial of this cause. She had about $11,000 in money, after buying a home.  Respondent was a real estate and investment agent; also, an admitted attorney at law, but not engaged in general practice.  He having been recommended to her as a man of reliability, she employed him to examine an abstract of certain property which she had bought, or was intending to purchase.  Subsequently she invested considerable money in warrants and delinquency tax certificates, this all being done through respondent.  In January, 1902, she purchased from or through respondent five thousand shares of mining stock, for which she paid $5,000 in cash.  She claims that respondent represented to her, as follows:  That he was buying this stock for her from the mining company; that the stock was very valuable; that the company had valuable improvements upon its property and would pay monthly dividends at the rate of ten per cent per annum upon her stock; that she would obtain the first dividend during the next month, February.  She testified that she was reluctant to make the investment, but was strenuously urged by him to so do, and made the purchase upon his advice, representations, and· urgent request.  Many of the representations which she claims that he made were, if so made, untrue.

Her testimony in support of all these contentions was disputed upon its material points by respondent.  The latter

claimed that appellant came to see him one day and asked if he knew of a good investment for her, saying that she for some reason disliked to be buying warrants and delinquency certificates as she had been doing, but preferred some other form of investment; that he told her he would sell five thousand shares of this mining stock to her for $5,000, and told her honestly and fully of the condition of the mining company and its prospects so far as he knew; that she took time to consider the matter, returning to talk it over two or three times before buying. Her contention and evidence was that she was relying upon respondent as her attorney and agent; whereas, respondent claims and testified that he was not her agent or attorney, and that there was no confidential relation or fiduciary capacity existing. The undisputed evidence of other persons adduced at the trial shows that the company was not selling any stock for more than fifty cents per share. Appellant maintains that she did not know that she was buying the stock from respondent; that he never told her that it was his stock, but did represent to her that he was buying it from the company, and that it cost $1 per share. Respondent denied that he had made investments for appellant, but claims that all of their dealings were such that, at the time of this stock transaction, there was no relationship of principal and agent, attorney and client, or other confidential or fiduciary capacity.

It appears from the evidence that appellant, some time after this sale, requested respondent to write a letter to a friend of hers in Pennsylvania informing the latter of appellant's business affairs and investments. Complying with this request, respondent wrote, as he admits, the following letter:

"Tacoma, Washington, February 11, 1902.
"Miss S. J. McIlwaine, Pittsburg, Penn.

"Dear Madam:—Mrs. Martha I. Landis, for whom I have been doing some business of late and making for her some investments, has frequently mentioned your name and said

to me that, if at any time I cared to drop you a line concerning her business, that to let you know about it the same as if it was being told to her, that you was a person in whom she had the utmost confidence and that you was her best friend.

"Now on such a good recommendation and with her permission I will say the Mrs. Landis' investments have been of three kinds, to wit: County tax certificates that draw a rate that net to Mrs. Landis ten per cent on her money, and are sure and safe, the second class of investment is county warrants that are purchased so as to make a rate on the investment of eight per cent and some times it happens to run much higher; for instance on one lot of warrants that were bought for $307.40 on October 15th, 1901, were called on the 10th of this month and the net profit will be $24.30, which makes the investment yield her a rate of about 30 per cent on the investment; of course not all of the rest of the warrants can be expected to do so well but in each investment they will exceed the eight per cent counted on, to make this rate run so high I buy the warrants from persons who want to use their money for other purposes and sell at a discount. The third class of investment was in some stock of a gold mine near Ketchikan, Alaska. This mine I have been watching for some time and upon learning of its proven richness bought $5,300 of the stock myself, and then I persuaded the owners who did not care to sell stock to let me have some for Mrs. Landis, and finally they consented to let it go, and on this stock Mrs. Landis gets a sure ten per cent dividend which is paid monthly and when the final dividend is paid between now and January 1st, 1903, she gets all over the ten per cent, the former part of the dividend I advance to her until the stock proves itself and runs above ten per cent.

"I am expecting to get for my stock at least three dollars for one within two years. I have lived in Tacoma since 1883 and this is the first time that I ever invested in mining stock, and you may feel sure that the mine must have been very good indeed to have induced me to take stock. I think that of all the investments that Mrs. Landis has this will be by far the most profitable one.

"With this much I will close for this time, and will be

ready to give other information that you may care to know. Yours Respty., J. A. Wintermute."

To our minds this letter furnished potent corroboration of appellant's testimony. That respondent had made investments for her, and that the relationship of attorney and client or principal and agent existed between them clearly appears from a reading of this letter. From the evidence in the case, it appeared that once a month for two years or more after the sale, respondent paid to appellant the monthly proportion of the ten per cent dividend which she claims he had told her would be paid by the company upon this stock if she purchased it. She supposed that these monthly payments were the dividends being paid on account of her stock. Respondent claims that he advanced these to her as a matter of courtesy on account of her having but little money on hand, expecting to be reimbursed when the company should get upon a paying basis. As a matter of fact, the company paid no dividends. Appellant now claims that the making of these monthly payments was for the purpose of allaying any suspicion she might have, and of preventing her from investigating the circumstances surrounding the purchase of the stock and ascertaining the true facts as to its ownership, value, and selling price.

It appears from the evidence that this mining company had some claims upon which it had done work and made improvements to the extent of twelve or fifteen thousand dollars, and that the tests made of the ore and the veins were such as to reasonably induce the belief that the property was valuable; that $2,800 worth of gold had been extracted from ore which had been taken from the claims, and that the prospects of the stock becoming valuable were good.

The case was tried in the superior court before the judge without a jury, and at the close of the evidence the case was dismissed for the reason assigned by the trial judge that he did not think plaintiff had made out a case. We have

been unable to arrive at the same conclusion. From the evidence, taken as a whole, having in mind the motives and inducements that ordinarily actuate people, we cannot believe that appellant would have paid $1 per share for this stock, when its highest selling price was only fifty cents per share, had she not been misled. We can hardly believe that appellant would have invested $5,000 in a purchase of mining stock from respondent if she had known that it belonged to respondent, without having made some inquiry and investigation concerning the company, of some other person having knowledge of its property and affairs. At least, it hardly seems credible that she would thus have made a purchase of his stock unless the relationship existing between them was of such a confidential nature as to induce her to rely upon his representations concerning the matter. It is not claimed that she knew anything about this company, or that she ever heard of it prior to the time respondent mentioned it to her. It appears from the evidence that she had been a farmer's wife, and that her experience in business matters was limited to those matters appertaining to the carrying on of a farm, and to looking after such notes and mortgages as secured the extra money which she possessed. It appears that she knew nothing whatever about mining companies, and was unfamiliar with the methods of business ordinarily obtaining among them; that she had never seen a certificate of stock prior to the purchase made herein.

We are not disposed to believe that respondent thought appellant was making a purchase of worthless stock. We think that he believed this stock to be valuable, and that it would become more valuable and make her a profitable investment. But the error of respondent was in not fully revealing to appellant all of the facts, and especially those as to his own relationship to this stock, and in making a profitable (to himself) sale to one who, upon the strength of the confidential relations existing between them, became the purchaser. Here was an old lady for whom he had been doing business—

engaging in transactions wherein she had relied upon his honesty and ability, and by reason of which she had come to feel that she could trust him.   Even if he believed that the stock was valuable and would become much more so, nevertheless he knew that he was selling to this appellant for $1 per share that which had cost him only half that sum; that he was making a sale which he could not have made but for the trust and confidence which she had in him and the representations which he had made.

One who acts as an attorney for a client, or as an agent for a principal, should not only be absolutely honest, but should use the utmost effort to make the dealings fair, frank, and honorable; and this is especially true in dealings with one inexperienced or otherwise incapable of self-protection.   And in transactions between attorneys and clients, or principals and confidential agents, courts will not be astute to find or recognize technicalities and subtle distinctions by means of which such attorneys and agents may escape the resposibilities resting upon them.   The fact that the past transactions of the parties have been such as to awaken in the one a feeling of confidence and trust toward the other, and that by reason of that faith such an one is further relied upon, goes a long way toward showing the latter transaction to be one arising from a confidential relationship.   Where such relations are shown to exist, the burden of showing the good faith of the transaction is upon the one asserting it.   14 Am. & Eng. Ency. Law (2d ed.), 194.

Not overlooking the kindly purposes respondent may have had in this transaction, we are nevertheless of the opinion that the circumstances inducing appellant to make the purchase of this stock were such that she was entitled, upon learning the real facts, to rescind said sale and have a return of the purchase money.

"A stock broker, in making sales or purchases for a client, may not act as both principal and agent in the same transaction without his client's assent given upon full knowledge

of the facts. If he assumes to do so the client may either repudiate the transaction or may affirm it and hold the broker to the price reported. . . . Also, the broker may not act as agent for both the buyer and seller in the same transaction. In each of the cases above mentioned it is immaterial whether or not there was actual fraud intended or actual injury done, such dealings being prohibited upon grounds of public policy." 26 Am. & Eng. Ency. Law (2d ed.), 1063.

Story, Equity Jurisprudence (12th ed.), at § 465, says: "One sustaining a relation of trust is never allowed to make any profit for himself." And the same author, at § 315, says: "There must be entire good faith and a full disclosure of all facts and circumstances." And at § 316: "If an agent sells to his principal his own property as the property of another, without disclosing that fact, the sale is void." In the case of *Ruhl v. Mott*, 120 Cal. 668, 53 Pac. 304, the supreme court of California said:

"Equity always views with strictness the business dealings of a man with one who stands in a position of dependence or confidence to him, when that relationship is either voluntarily assumed or is imposed by operation of law."

It is urged by respondent that appellant, after discovering, or being in a position to discover, the real facts as to the stock and the mining company, neglected for a long time to rescind, but continued to receive the monthly payments which respondent was making in lieu of dividends. It appears that, after she had been informed that this stock had been sold by the company for fifty cents a share, instead of one dollar, she called upon respondent and asked to see his certificates of stock. They were shown to her. She saw printed upon these certificates the words, "Shares $1 each." From this she inferred that his shares had cost $1 each, being inexperienced, and not knowing that those words indicated the par value of the stock rather than its selling price. This and other matters allayed her suspicions temporarily, and delayed her taking action in the matter. But we do not think

her conduct and delay amounted to a waiver of her right to rescind.

It also appears that, after the commencement of this action, appellant attended one of the meetings of the stockholders of this mining company, and participated therein as an owner of this stock. It is contended by respondent that this amounts to a ratification of the purchase, and a waiver of any rights which she might have had to a rescission. We do not think that this action of the appellant constituted an estoppel. She had tendered this stock to respondent prior to the commencement of this action, and demanded the return of her money, which had been refused. She was therefore left in possession of the stock. The voting of it at the meeting in our opinion does not militate against her rights in this action. In fact, we are not sure but that it was her duty as the holder of that stock to be at said meeting and vote the same in the interests of the company, instead of remaining absent and neglecting the interests represented by said stock. 1 Cook, Corporations (4th ed.), § 356, says:

"Where a party has a right to return the stock and receive back his money, he may, after making a tender, do any acts in regard to the stock reasonably necessary to protect his interest, and yet not lose his right to rescind."

The judgment of the honorable superior court will be reversed, and the cause remanded with instructions to enter a judgment in favor of appellant in a sum equal to the difference between $5,000 and the total amount paid by respondent to the appellant in the monthly payments referred to, interest on neither sum; the stock and certificates representing the same to be delivered to, and become the property of, the respondent upon his satisfying said judgment. Costs to appellant.

MOUNT, C. J., CROW, DUNBAR, HADLEY, FULLERTON, and RUDKIN, JJ., concur.