[No. 15051.  Department One.  May 15, 1919.]

M. D. COGSHALL, *Respondent,* v. E. C. JONES *et al.,* *Appellants.*[1]

REFORMATION OF INSTRUMENTS (4)—GROUNDS—MISTAKE.  Where, in an exchange of properties, plaintiff's deed, by inadvertence and mistake, included property that did not belong to her, she is entitled to have the deed reformed.

PRINCIPAL AND AGENT (15, 17)—MUTUAL RIGHTS—PROFITS MADE BY AGENT—FRAUD—EVIDENCE—SUFFICIENCY.  Where a trade of lands was made by a woman with one who had acted as her local rental agent, the agent having purchased a tract for $875 for the purpose of trading it to her at a valuation of $4,000, the agent is not liable to account to her for his profits on the ground that he had violated a confidence reposed in him, where it appears that each party was in business for profit, and the agent was not trusted, but the principal acted upon the advice of her own investigator and did not at the trial question the agent's valuation of the land she had received.

Cross-appeals from a judgment of the superior court for Skagit county, Brawley, J., entered April 8, 1918, upon findings in favor of the plaintiff, in an action for reformation and for an accounting, tried to the court.  Affirmed on plaintiff's appeal; modified on defendants' appeal.

*Coleman & Gable,* for appellants.

*Fred C. Campbell,* for respondent.

MITCHELL, J.—The plaintiff, Mrs. M. D. Cogshall, exchanged real estate with defendant.  Alleging that she included in her deed a greater quantity of land than was intended, that defendant made a profit of $3,125 by the deal, and that the relations existing between the parties was such as to make him liable to her for the profits, she brought this action for a reformation of her deed of conveyance and for an accounting and recovery of the profits.  Upon the trial, the

[1]Reported in 180 Pac. 898.

court found that by mistake plaintiff's deed conveyed more property than was intended, and entered judgment accordingly, describing and decreeing to defendant that which was meant to be conveyed. The court also found that, subsequent to taking title, defendants had placed a mortgage upon the whole of the property conveyed, and gave plaintiff a lien upon defendants' portion to the extent necessary to protect the property restored to her from the lien of said mortgage; and provided, if plaintiff should be required to pay in order to free her property from the lien of such mortgage, she should be entitled to a judgment against defendants for such amount, with the right to foreclose the lien upon their portion. The court further found that the relations existing between plaintiff and defendant E. C. Jones consisted so largely of confidence reposed in him in making the trade that he was liable to her for profits he had made, which, after allowing him a real estate commission of five per cent, amounted to the sum of $1,345.83, in which amount a personal judgment was awarded her against E. C. Jones and his wife. Defendants have appealed from the judgment entered. On the other hand, plaintiff, feeling aggrieved at the alleged inadequacy of the personal judgment, has taken a cross-appeal, claiming she is entitled to judgment in the sum of $3,125.

As to the decree of reformation of the deed, we are satisfied it was warranted by the facts. In his lifetime, respondent's husband, S. M. Cogshall, was a creditor of the Cogshall-Metzger Mill Company, of which he was president. In payment of its debt, the mill company conveyed to him the property herein decreed to appellant. At the time of that conveyance, however, the property was subject to a mortgage, and to protect its grantee the mill company conveyed to

him other property (including that restored to respondent by the judgment herein), with the understanding that, upon payment of the mortgage by the mill company, S. M. Cogshall would reconvey all of such other property to the mill company. Later, and not a great while prior to his death, which occurred in 1912, S. M. Cogshall conveyed all the property here involved to his son, S. B. Cogshall, in trust for the benefit of respondent. The mill company paid off the mortgage, but by neglect or oversight never received the reconveyance it was entitled to. At the time of the exchange of the properties between respondent and appellant, she knew, and it is satisfactorily deducible from the proof that he knew, she was the beneficial owner of only that portion of the property now awarded to him and his wife; but in making the deeds from the son to respondent and thence to appellant, on account of unfamiliarity with the descriptions, they erroneously and unintentionally included property belonging to the mill company. It was clearly a mistake, and appellant at the trial testified, in effect, that he believed she made a mistake in including property that really belonged to the mill company.

For the purposes of the other contention in the case, as we view it, the facts are about as follows: The property now declared by the judgment to be the property of appellants and intended to be conveyed by respondent consists of certain lots and four small residences in Sedro Woolley. Appellant, for a number of years, has been engaged in the real estate business in Sedro Woolley, taking the listing, for sale or trade, of lot, acre, and farm properties in and around Sedro Woolley and throughout Skagit and other counties of the state. He acted as agent for S. M. Cogshall, and then for respondent after her husband's death, in rent-

ing, collecting rents, and having some of the repairs made on the property only after he was so directed by the owner. Appellant never had any other business relations with respondent except those and the trade in question. Some of the most important repairs on the houses were attended to by respondent's son independent of appellant.

Respondent was familiar with her property for several years prior to 1910, but lived in Tacoma and never met appellant until the summer of 1916, just before the trade. On December 4, 1912, the son of respondent wrote to appellant asking if he thought there was any chance to sell all or any part of respondent's property and the price it would bring. The letter seems not to have been answered. Later, the son told appellant his mother wanted to dispose of her property, that if she could not sell it she would consider a trade, and now thinks he said she wanted $4,000 in cash, or more if it was traded. The last statement as to value appellant denied. Appellant told him that very little real estate was changing hands and he doubted if he could sell it. There was nothing said about commission nor was the property listed for sale or trade. Shortly afterwards, appellant showed the son a piece of property which he offered to trade for a part of the property, but the offer was declined. On May 22, 1915, apparently in answer to an inquiry from respondent, appellant wrote: "It is very hard to sell town property now . . . However, if you care to trade it for good logged-off land I might get you a trade." On May 26, 1915, she replied: "What can you submit for a trade in logged-off land? I might consider something in that line." Upon receipt of the letter, he submitted to her two offers to trade. One piece of property belonged to a client whose name was

not disclosed, and the other belonged to himself. The son examined both pieces and was not pleased. About this time, the owner of the eighty acres, who lived in Idaho, gave appellant a written contract to sell it for $900, appellant to have all he could get over that amount, but was to furnish an abstract if one was required. On sending the contract, the owner stated the land cost him more, but that he could use money to advantage at that time. On June 7, 1916, appellant wrote to respondent, saying he had a piece of logged-off land for which her property could be traded, gave the location and description of it, and said: "I think this would be a very advantageous trade for you. I will be pleased to have you or your son come and look at it." Upon her request, he wrote on June 23, 1916, giving the legal description of the land proposed to be traded to her, valued it at $4,000, and said: "I will be pleased to show you or your representative this proposition at any time, and will do all I can to get you a good deal." The property referred to is the eighty acres she finally traded for, and it may at this time be noted that at the trial respondent's attorney stated to the court that no question whatever was raised as to the value of the property respondent got, as compared with that she exchanged, that she was simply demanding the profits made by appellant in the trade; and the trial proceeded accordingly.

On receiving his letter of June 23, 1916, she wrote her son in Sioux Falls, S. D., asking his advice. He answered that he knew nothing of the land offered and could not advise her other than to suggest that she get their friend, Mr. George Cotton of Tacoma, to look at the property and report thereon. She procured the services of Mr. Cotton, an old friend of the family and a real estate agent for thirty-six years, who at her

expense personally examined the land in July and made a report to her fully describing it and its surroundings. Mr. Cotton was advised of the proposed trade before going to Skagit county, and while there he also examined her property. Upon his return, he gave her a plain statement of all he found out about the two properties and told her when she made up her mind he would write to appellant for her and help her in any way he could. Appellant went to Tacoma and saw respondent for the first time. He then offered to trade her a residence in Seattle or a tract of logged-off land near Seabeck, Washington. By arrangement, he and Mr. Cotton went to see the Seabeck land and she examined the Seattle property. Upon their return to Tacoma, she had not decided which, if either, property she would trade for. She said she did not want to pay any commission, and was told by appellant that, if she traded she would not have to pay any, that his pay would come from the other party. Within a few days, July 15, 1916, she had Mr. Cotton write that she would trade for the eighty-acre tract. Appellant at once wrote to the owner in Idaho of the trade offered, but he promptly said he would not trade for Sedro Woolley property, that he wanted only to sell. Appellant bought the eighty-acre tract for $875, and furnished a $25 abstract to carry out the trade with respondent. After being advised she would make the trade, all correspondence and business thereafter was conducted by her through Mr. Cotton, who prepared the deed from the son to respondent and the one from her to appellant, looked after and passed upon the abstracts and transfer of insurance policies and transmitted the deeds to a bank at Sedro Woolley, which finally delivered them on October 4, 1916. Before the exchange of deeds, re-

spondent was advised that the deed she executed should run to him and that, through his deed, she would get title to the eighty acres. In further proof of the business caution she used in her dealings with him and her care in having a definite understanding, it is worthy of notice that, after she got the eighty acres, she wrote to him on October 27, 1916, as follows:

"In one of your letters regarding the land which I now own you spoke of the timber on it and that there was some show for a sale of the same. Could that deal still be considered? Of course I want to sell it, and think perhaps it ought to be looked after while other timber is moving there. Would you look after my interests in this matter, and if so on what terms?"

Counsel for respondent contends the case of *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899, "is clearly decisive of the case at bar." We do not think so. In that case, the agent looked after all of his principal's property, she being a nonresident of the state. While having no authority to sell, he did find purchasers to whom sales were made. "She came to *depend* upon him in some measure for information and advice concerning conditions in Seattle and vicinity affecting her property there not only as to its earnings, but as to the possibility of its sale." She took his advice as to the purchase of other property in Seattle. Many confidential business letters passed between them, in which, among other things, she told him: "I shall be glad to keep in communication with you and to be advised by you." "I depend upon *your* advice above all others." "I have such confidence in your judgment I would value your opinion if you would favor me with it as in the past." Out of business respect for her agent, she sent him the season's greetings at Christmas time. The agent was offered $10,000 for the land, and shortly thereafter he had a party go to

the local attorney of the owner and offer $7,500 for it.
The lawyer communicated the offer to the agent and
asked his advice. The agent told him the offer was
a good one, that it was all the land was worth, and
that he thought the owner should be advised to accept
it. She was advised of this by her lawyer, through
whom she delivered her deed running to the agent's
friend that had made the offer, who had been sup-
plied with the money by the agent, who in turn took
a conveyance to himself. The agent was held liable
to account. That was a case in which, by a course of
dealings, the confidence of the principal had been won
by and expressed to the agent who deliberately initi-
ated a plan to deceive and defraud, and thereafter
carried it out by expressing a false judgment intend-
ing and believing it would be effective. It was a case
in which the owner never sought any other advice.
Clearly that is a different case from this.

Respondent cites a number of cases from this and
other courts in support of the rule stated in *Dutton v.
Willner*, 52 N. Y. 312, quoted in *Neis v. Farquharson*,
9 Wash. 508, 37 Pac. 697, as follows:

"It is a well settled and salutary rule that 'a per-
son who undertakes to act for another in any matter
shall not, in the same matter, act for himself.' "

The rule is universal, but assumes the existence of
a relation different from that shown to have existed
between these parties. The facts in this case speak
for themselves. They do no violence to the principles
of technical morality recognized by courts of equity.
Each party was engaged in business for profit. As
between themselves, each represented himself. True,
"if confidence is reposed, it must be faithfully acted
upon, and preserved from any intermixture of im-
position;" but here, even while acting for years as a

rental agent, appellant was not trusted by respondent to even have a roof repaired, a house painted, a room papered, or a sidewalk built, without specific directions from her; and she even sent her son to attend to a part of such matters. It is also true, "if influence is acquired, it must be kept free from taint of selfish interests;" but he never asked for nor received her property for sale during all the years she desired to sell; nor did he ever volunteer, nor was he requested by her, to value it; nor can it be said he improperly influenced her in his valuation of $4,000 put on the eighty acres, when in due course of business he at that time had it for sale for another, because of two reasons; first, he was offering to trade with her and her son had recognized the rule in such cases, for he testified that, in speaking of the desire of his mother to dispose of her property, he told appellant she wanted $4,000 cash, but *more if it was traded;* and, second, because, at the trial, she made no question but that the eighty acres was actually worth $4,000. And again, "if the means of personal control are given, they must be always restrained to purposes of good faith and personal good;" but he was given no personal control; we have seen she never placed her property with him for sale; she did not write she wanted him to trade her property for logged-off land, but "What can you *submit* for a trade in logged-off land?" Subsequent events proved she did not mean to give him any personal control; for, upon getting his offer, she immediately took it up, through her son and the old family friend, Mr. Cotton, who represented her in all things until the deal was closed. Manifestly, he did not attempt or expect any personal control, for it is significant that in each of the six propositions to trade made by him he requested her to have her representative examine the property; and

it is a fact that, in each and every case, before deciding, either her son or Mr. Cotton or herself did examine the property. Under the circumstances, we conclude the appellant was under no obligation to account for profits he may have made in the trade, and that the judgment against him in this respect was erroneous.

Incidentally, appellant complains of the cost bill finally allowed by the trial court. An examination satisfies us it was correctly settled.

Respondent's cross-appeal is hereby decided adversely.

The cause is remanded with directions to the trial court to modify the judgment in conformity with this opinion. Appellants will recover their costs of appeal.

CHADWICK, C. J., TOLMAN, MACKINTOSH, and MAIN, JJ., concur.