[No. 31027.   Department Two.   November 30, 1949.]

JOHN F. HOOD et al., *Appellants*, v. ROBERT L. CLINE et al.,
*Respondents.*[1]

[1]Reported in 212 P. (2d) 110.

*Cameron Sherwood* and *Herbert H. Freise,* for appellants.
*George W. Thompson* and *Tuttle & Luce,* for respondents.

ROBINSON, J.—Plaintiffs, John F. Hood and his sister, Ida Hood Brown, brought this action seeking a decree rescinding the sale of their remaindermen's interest in a 310-acre wheat and pea farm located in Walla Walla county, Washington, and Umatilla county, Oregon. The gist of their action was fraudulent concealment and misrepresentation on the part of the purchasers, Wilbur A. Toner and Robert L. Cline, and violation of a confidential or fiduciary relationship allegedly existing between themselves and defendant Toner. From a judgment of dismissal, they have taken this appeal.

As each case of this nature must depend, to a peculiar degree, on its particular facts, we have deemed it necessary to discuss those here involved in some detail, giving particular attention to the correspondence on which appellants chiefly rely to establish the existence of the fiduciary relationship and, indeed, the fraud itself.

The farm in question formerly belonged to John A. Hood, the father of appellants, who died in 1938. In his will, he left a life interest in his property to Augusta Hood, his

widow and appellants' stepmother, and an undivided one-half of the remainder interest to each of the appellants. This property included the farm. Appellant John F., or "Fred," Hood, lived in Oregon; appellant Ida Hood Brown, in California. Neither had lived on the farm for many years, and Fred Hood had not even visited it since 1923.

Respondent Wilbur A. Toner has, with brief interruptions, practiced law in Walla Walla since 1905, when he associated with J. G. Thomas in the firm of Thomas and Toner. In 1934, he severed his connection with Mr. Thomas, and removed to Olympia where he was an assistant attorney general until 1941. In that year, he returned to Walla Walla. The partnership was resumed and continued until Mr. Thomas' death in January, 1945.

For many years, Mr. Thomas had been attorney for John A. Hood. When Mr. Hood died, Mr. Thomas was attorney for the estate. However, during the Oregon probate proceeding, Mr. Thomas and Augusta Hood, who was executrix for the estate, had a disagreement, and it appears that, before probate of the estate was completed either in Washington or Oregon, she dispensed with his services and retained Mr. W. G. Coleman. Mr. Coleman died in 1942, and Mrs. Hood subsequently hired other attorneys to do her legal work. There was no evidence that she ever again employed Mr. Thomas. At the time of Mr. Hood's death, Mr. Toner was, of course, in Olympia, and had nothing to do with the probate of the estate.

In 1943, before the estate had been closed in Washington, Mrs. Hood contracted to sell certain lots belonging to it. She retained Mr. Judd Kimball as her attorney to draw up the contract of sale. The title report, issued in February, 1945, showed that she had only a life estate in the lots. She then went to Mr. Toner and obtained from him a copy of her husband's will which was in the files of his office, and she employed him to obtain the necessary deeds from appellants, who, of course, held the remainder interests.

Mr. Toner wrote to appellant Fred Hood in April, 1945, enclosing a deed and offering him fifty dollars if he would

sign it. Fred Hood replied, indicating suspicion of his step-mother and stating that he did not intend to sign the deed until he could investigate further. On June 29, 1945, he wrote Mr. Toner as follows:

"Enclosed you will find my notarized signature on Quit Claim Deed as you requested. I have varied information concerning those lots, some say they might be worth a great deal more, more others say not, so if I can get $50.00 out of the deal I will be glad to get it, as I have been ill since March 12th with a heart ailment and don't know when I will be able to go to work again and what savings I had are about gone, as room rent, food, Dr.'s bills and medicine bills go on just the same. I had written my sister not to sign anything, but am now writing her that she may if she wants to, as kind of. left it up to me."

Upon receipt of this letter, Mr. Toner wrote appellant Ida Hood Brown requesting her signature on the deed. On July 12th, he sent a check for fifty dollars to Fred Hood, and initiated the transaction which is involved in this case in the following manner, the "ranch" referred to being the wheat farm with which we are here concerned:

"I was sorry to hear that your health is not so good. Maybe you won't outlive the old lady, she seems to be able to get around pretty good.

"Do you want to sell your interest in the ranch? I haven't much of an idea about what it is worth. The appraisement indicated about $20,000.00. Chances are that it would be up about 20%, and would be worth $26,000.00 to $30,000.00.

"I might get a chance to sell it if you want to sell, provided the purchasers could make a reasonable deal on it. I would probably have trouble dickering with your old lady, but if I could get you and Ida interested in a reasonable price for your interest then I might dicker with the old lady.

"At any rate, a reasonable sum at this time might be better than one-half interest in a ranch which you might not get title to as long as you live, because sometimes these old ladies live longer than we younger people."

On October 1st, nearly three months later, Mr. Toner wrote Fred Hood again, asking why he had not heard from him, and on October 15th, he wrote Ida Hood Brown, mak-

ing substantially the same proposition as he had to her brother:

"Of course, it might not be the best time to sell because of the conditions of the title. On the other hand, it is quite likely that the farm could be sold for more at the present time than it could be later. The ditches through it carry morning glory and where the tenant tries to get the best returns he won't spend much to control the pest. . . .

"I think the farm should be worth at least $30,000.00. If it brings in an income of two thousand dollars a year, the life estate would probably be worth $15,000.00, calculating that Mrs. Hood will live ten years. That would leave about $15,000.00 for you and Fred."

Mrs. Brown replied that she was willing to sell, as she knew that, if the morning glory got worse, it would not help the sale of the property. Mr. Toner replied, on November 29th, saying:

"I can get you and Fred $7,500.00 each, provided I can purchase Augusta Hood's interest for about the same amount, that is, $15,000.00."

A copy of this letter was sent to Fred Hood, who replied on December 6, 1945, as follows:

"I have put off writing to you because I have been unable to decide what to do about selling our interest in the farm. Ida and I both agree that the farm should be worth more than $30,000.00. We are asking $9,000.00 apiece for our interest. Whatever amount you would have to pay Augusta Hood wouldn't be any of our concern I don't think. As far as my needing the money for my part I surely do, worse than at any time in my life. . . .

"If you can get us $9,000.00 each for our interests, let us know as soon as possible, and if you can't, let us know also. . . ."

To this, Mr. Toner replied:

"I am not at all sure that I can get Augusta Hood to sell her interest for any reasonable sum, but if you and Ida will reduce your price to $8,500.00, I think I can make the deal anyway. . . .

"If you and Ida will execute the deeds which I am sending you before a Notary Public and return them to me we can get this deal closed up, and the deal will be an all cash transaction."

This was the price settled on. The deeds were executed and mailed to Mr. Toner.

On December 20th, Mr. Toner wrote Fred Hood a letter stating that he had received the deeds, and that, as soon as the title report was out, the money would be ready. On January 9th, Fred Hood sent Mr. Toner a wire, "What's holding up land deal, need money badly. Reply." Mr. Toner replied as follows:

"The Dean McLean Abstract Company says that the J. A. Hood estate in Walla Walla County ought to be closed up and I do not know whether or not I can get your mother-in-law to close it up. . . .

"If I can get . . . my client to close it up on the agreement that I will get the Hood Estate closed up shortly, we can close the deal all right."

This was followed by considerable correspondence between Mr. Hood and Mr. Toner. The former repeatedly urged that the money be sent to him, as he was "practically destitute," and "sure . . . in need of funds." Mr. Toner sent each of the appellants a payment on the land, and explained that payment of the rest was being held up pending closing of the John A. Hood estate, as the abstract company required that this be done before it would insure the title.

In March, Fred Hood made a trip to Walla Walla. In his deposition, taken prior to the trial, and subsequently introduced into the record, he testified concerning this trip as follows:

"Q. Now, from the time your father died in 1938 to the present time, did you visit or correspond with neighbors living near that ranch? A. In 1946. Q. With whom did you correspond in 1946? A. The Nuttall family, Henry Copeland. Q. Who else? A. That is all. Q. What was your correspondence with them about? A. Correspondence? I didn't correspond with them, I talked to them on the trip up here in 1946. Q. Did you correspond with anyone up here? A. No. Q. What did you talk to them about on that trip? A. Farm values and conditions of the crops. Q. Farm values? A. And condition of the crops. Q. When was that? A. March 21st or 22nd, 1946. Q. Why did you talk to them

about farm values, Mr. Hood? A. *Because I began to be suspicious that I made a poor bargain when I sold my equity.*" (Italics ours.)

On June 4th, Fred Hood wrote Mr. Toner again, informing him that a settlement with his former wife and various doctor and hospital bills had taken most of his money, and asking for another advance. Concerning his March trip, he testified:

"I would like to go into some little business that I could handle if only a cigar store, if I could keep enough money to handle it, but so far it has been nothing but pay out.

"I made a fast trip thru Walla Walla in March, was out to the farm. I never saw the place in better shape. The pea ground land was just like a garden and the wheat looked fine. Talked to Erdman a few minutes, was in a hurry, did not have time to drop in to see you, as I was going on to Pasco and Yakima, was looking for a spot, as I had a little money then, . . ."

On August 27th, Mr. Toner sent each of the appellants another payment on the land, and stated, in the accompanying letter to Mr. Hood, that:

"This will leave $500.00 owing to you as soon as Augusta Hood gets the probate proceedings in your father's estate closed up so that we can get a clear Certificate of Title. I am going to try to close this up as soon as I can."

On February 14, 1947, Mr. Toner sent a final payment of four hundred dollars to each of the appellants, and stated that the small amount remaining to be paid would have to be held out, as Mrs. Hood was refusing to sign the final account in her husband's estate, and it would be necessary to conduct an administration after her death, a proceeding that would involve certain expenses. Ida Hood Brown received an equivalent amount. The total received by appellants amounts to seventeen thousand dollars, less these anticipated expenses, and less the cost of title insurance and stamps, which Mr. Toner charged to them.

Appellants were under the impression that the purchaser of their interest in the farm was respondent Robert L. Cline, a local rancher. The deeds named him as such. Mr.

Cline, in fact, had purchased a half-interest, but Mr. Toner had himself purchased the other half-interest. This had come about, according to the testimony of respondents, in the following way: It appears from the outset that Mr. Toner had thought of buying the farm himself. He testified that he tried to interest his mother in it, but that she would not buy it. He remained interested in it, however, as he buys and sells real estate; he stated that had he bought the property, he probably would have held it for resale.

He testified, however, that, after October, 1945, he was writing appellants on behalf of Mr. Cline, who was temporarily occupying Mr. Thomas' former office adjacent to his own, and who had been looking for a ranch for his son. According to Mr. Toner's testimony, Mr. Cline, after learning from Mr. Toner that he could probably buy the Hood ranch, entered the transaction as an active purchaser around November. Mr. Toner testified that his letter of November 29th, in which he told Ida Hood Brown that he could get her and her brother $7,500 each for the property, was written in Mr. Cline's behalf.

Mr. Cline testified that, in January, he became doubtful as to whether he should go through with the transaction, because of difficulties which had arisen in connection with getting the title insured. It was then, according to the testimony of both Mr. Cline and Mr. Toner, that the latter agreed to purchase a half-share in appellants' remainder interest, as well as in the life estate of Mrs. Hood, should she be willing to sell it. The parties agreed that this agreement would be confidential. The trial court found that Mr. Toner had personal reasons for this secrecy, growing out of his marital situation. In any event, Mr. Cline remained the ostensible purchaser, and appellants did not learn of Mr. Toner's status as copurchaser until the proceedings resulting in this suit had been instituted.

As the above-quoted correspondence suggests, Augusta Hood was strongly averse to selling her life estate in the farm, and respondents were unable to buy it from her. Mrs. Hood was then seventy-five years old. Over two years went by, during which time, as all of the testimony demonstrated,

the value of wheat land in the Walla Walla area greatly increased. On April 11, 1948, Mrs. Hood died as the result of a cerebral hemorrhage, and respondents became owners of the farm in fee simple. Fred Hood's son came to the funeral, and testified that he there discussed the matter of the sale of the farm with Mrs. Hood's niece. The niece being of the opinion that appellants had sold their interest for far less than it was worth, the son returned to Oregon and talked to his father; as a result, he testified, this action was subsequently brought. Meanwhile, a few days after Augusta Hood's death, Mr. Toner sold his half-interest in the farm to Mr. Cline for the sum of $30,500.

Appellant's principal contention on this appeal is that a fiduciary relation existed between themselves and Mr. Toner. They contend that, this being the case, following the reasoning of *Landis v. Wintermute,* 40 Wash. 673, 82 Pac. 1000, *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899, and other cases, to some of which we shall refer, he was obliged to reveal to them the nature of his participation as purchaser. Our first problem, therefore, is to determine whether a fiduciary relationship was actually present, and, in considering this question, it is well to keep in mind the following observation from *Collins v. Nelson,* 193 Wash. 334, 75 P. (2d) 570, where this court said:

"To establish a fiduciary relationship upon the violation of which fraud is sought to be based, there must be something more than mere friendly relations or confidence in another's honesty and integrity. There must be something in the particular circumstances which approximates a business agency, a professional relationship, or a family tie, something which itself impels or induces the trusting party to relax the care and vigilance which he otherwise should, and ordinarily would, exercise."

Appellants' argument reduces itself to the contention that the asserted fiduciary relationship in this case grew out of the following four factors, either operating separately or in combination: (1) The long and friendly relationship between themselves and Mr. Toner; (2) His alleged status as their lawyer, and as lawyer for the John A. Hood estate;

(3) His alleged status as their agent for the sale of the land;
(4) The confidence which they claim to have reposed in him throughout the transaction and the resulting influential position attained by him and employed to his advantage. We shall consider these factors in the order listed.

It is unnecessary to discuss the first point at length. It is true that, in some of our cases, notably *Gray v. Reeves*, 69 Wash. 374, 125 Pac. 162, we have considered that intimate friendship may, under certain circumstances, justify one in relaxing the standard of caution he would normally exercise in business dealings. But nothing in the record before us shows that the alleged friendship in this case was at all close. The families of Mr. Hood and Mr. Toner had been friendly when both men were children, and Mr. Toner and Fred Hood had gone to school together. During the many years that Fred Hood and Ida Hood Brown were away from Walla Walla, however, there was no communication between either of them and Mr. Toner prior to the transaction involving the sale of the lots. The correspondence introduced as evidence into this case indicates that appellants were on a first-name basis with Mr. Toner, but suggests no more than that. As a whole, it may be said that the evidence fails to demonstrate that appellants would have been justified in relying on Mr. Toner because of their mutual friendship, nor does it show that they in fact did so.

The claim that Mr. Toner ever acted as appellants' lawyer appears to be without foundation. That an attorney is in the highest degree responsible for the protection of his client's interests is a proposition no one would debate; see *In re Peterson's Estate*, 6 Wn. (2d) 294, 311, 107 P. (2d) 580; and were an attorney-client relationship shown to exist here, *Landis v. Wintermute, supra,* and other cases cited by appellants, might well be strong authority for their position that Mr. Toner's concealment of his interest in the purchase of the property amounted to a fraud upon them.

The evidence in the case, however, does not show such a relationship. It is admitted that Mr. Toner's former partner, Mr. Thomas, handled most, if not all, of the legal

work for John A. Hood while the latter was alive, and that Mr. Toner himself had, on occasion, participated in minor matters with which John A. Hood, or his first or second wife, were concerned. But the evidence that Mr. Toner ever acted as attorney for Fred Hood, or Ida Hood Brown, prior to the transaction involving the sale of the lots, is quite inconclusive, and, in their depositions, each of the appellants admitted that this was the first time he had done so. Even in the lot transaction, however, it is apparent from the correspondence involved that Mr. Toner was acting for Mrs. Augusta Hood rather than for the appellants.

We, therefore, do not have a situation such as was presented in *Conner v. Hodgdon,* 120 Wash. 426, 207 Pac. 675, where it was not disputed that the defendant had previously acted as attorney for the plaintiff, and the question involved was whether their relationship had terminated at the time of the transaction resulting in the suit. Here, any attorney-client relationship between the parties must be shown to have actually arisen out of the dealing surrounding the sale of the farm. Again, the evidence does not show such a relationship. Appellants never suggested that they were retaining Mr. Toner as an attorney, and he did nothing to indicate that he thought of himself as acting in that capacity. At least in the later stages of the transaction, Mr. Toner was patently acting for Mr. Cline, and in one of his later letters to Fred Hood, referred to the latter as "my client."

Appellants also contend that Mr. Toner was acting for the estate of their father, John A. Hood, or if not, then, at least, that they believed he was doing so. It is true that Mr. Thomas had been the estate attorney until his disagreement with Mrs. Hood, the executrix, but this was during a period when Mr. Toner was not a partner of Mr. Thomas. In any event, the proof shows that, after this disagreement had taken place, she did not again retain Mr. Thomas, but employed other attorneys when she found it necessary to do so. She came to Mr. Toner once. The trial court observed of this:

"Mr. Toner did have one business transaction with her, but it grew out of a transaction handled by another attorney and she came to Mr. Toner because she thought his familiarity with the estate would enable him to straighten out her difficulty."

It does not appear that Mrs. Hood ever regarded Mr. Toner as her attorney in the estate. When he ultimately attended to the closing of the estate after her death, he appears to have done so at the insistence of Mr. Cline, who wished to have his title to the property cleared.

It is difficult to believe that appellants would have been justified in assuming that Mr. Toner was acting as attorney for the Hood estate in dealing with them. Of course, they knew that Mr. Thomas had been their father's lawyer, and they went to his office for the reading of the will. Nevertheless, Fred Hood testified in his deposition:

"Q. What correspondence did you have with Mr. Thomas between 1938 and the present time? A. Regarding some mountain land. Q. Was that part of your father's estate? A. It was. Q. Whom did Mr. Thomas represent in that estate? A. I couldn't say he represented anybody. Q. Isn't it true that Mr. Thomas represented your step-mother as executrix of the estate? A. No. I wouldn't say it was true that he did."

If appellants were unaware that Mr. Thomas had been attorney for the estate, they certainly had no reason for believing that Mr. Toner was acting in that capacity. It is true that Mr. Toner, in his later letters, referred, on occasion, to his intention to get the estate closed, but again it is apparent, from the context of these references, that his interest in the matter lay only in clearing title to the farm.

██ Appellants' assertion that Mr. Toner acted as agent for them, perhaps deserves more detailed consideration. Unquestionably, there was a certain amount of ambiguity in their relationship, arising from the fact that Mr. Toner, in his early letters to them, failed to make any specific disclosure of his motives in suggesting that they dispose of the property. Their allegation that he was acting for them, or at least that they believed he was acting for them,

receives support from some of the wording of the correspondence. Thus, in his letter of November 29th, Mr. Toner wrote Ida Hood Brown:

"I can get you and Fred $7,500.00 each, . . ."

while Fred replied, on December 6th:

"If you can get us $9,000.00 each for our interests, let us know as soon as possible, and if you can't, let us know also. . . ."

These words, considered by themselves, seem to import an agency relationship. But when the transaction is considered in its entirety, an opposite conclusion seems to be required. It is clear that, in the prior transaction involving the sale of the lots, appellants did not regard Mr. Toner as acting for them. Fred Hood refused to sign the deeds, and advised his sister not to sign them until he had made an independent investigation. It was out of that transaction that the present one developed. In his first letter on the subject, Mr. Toner stated, "If I could get you and Ida interested in a reasonable price for your interest then I might dicker with the old lady," suggesting that he was acting, not in behalf of appellants, but for the benefit of a prospective purchaser. Subsequently, as the previous correspondence shows, he wrote the letter mentioning the figure of $7,500 apiece for each of the appellants' interests. Meanwhile, Fred Hood had not replied to his first letter, and did not do so until almost five months had elapsed from the time it was written. When asked the reason for his delay, he testified:

"A. I was writing back and forth on this and that and trying to get it straight and making up my mind. . . ."

When he finally did reply, he did not accept Mr. Toner's estimate of either the value of the land ($30,000), or of the interest held by himself and his sister in it. "Ida and I both agree that the farm should be worth more than $30,-000.00. We are asking $9,000.00 apiece for our interest." He testified:

"Q. The letter of December 6th, continues 'We are asking $9,000.00 apiece for our interest' How did you arrive at that?

A. Just viewing it. Q. And you didn't rely on Mr. Toner? A. He said he was buying it for someone else. Q. And you knew he didn't represent you? A. What difference did that make?"

Viewed as a whole, the transaction appears to have amounted to nothing more than the ordinary bargaining between an offerer and offeree. From the outset, Fred Hood, who seems to have made the final decisions for both appellants, appears to have been concerned to protect his interests, and to have placed no special reliance or confidence in Mr. Toner. As the trial court found, "His whole conduct was that of a man who was using his own judgment in the sale," rather than that of a man trusting in the representations of his agent.

The case is, therefore, plainly distinguishable from such cases as *Ackerson v. Elliott,* 97 Wash. 31, 165 Pac. 899, where an agency relationship had admittedly existed between an owner of property and its secret buyer, who had advised the owner to sell. It is well settled that a person who undertakes to act for another in any matter shall not, in the same matter, act for himself. *Neis v. Farquharson,* 9 Wash. 508, 37 Pac. 697. The rule is universal, but assumes the existence of a relation different from that shown to have existed between these parties. *Cogshall v. Jones,* 107 Wash. 140, 180 Pac. 898.

But appellants contend that, even if the relationship of the parties was not technically either that of attorney-client or agent-principal, nevertheless appellants reposed special confidence in Mr. Toner, arising principally out of the long association which his law firm had had with their family, and that this in itself amounted to a fiduciary relationship under the authority of such cases as *Wheeler v. Yoakam,* 136 Wash. 216, 219, 239 Pac. 557, where, quoting *Miranovitz v. Gee,* 163 Wis. 246, 157 N. W. 790, we said:

" 'A fiduciary relation exists when confidence is reposed on one side, and there is resulting superiority and influence on the other; and the relation and duties involved in it need not be legal, but may be moral, social, domestic, or merely personal.' "

Confidence alone is not enough to establish a fiduciary relationship, as is indicated by the excerpt from *Collins v. Nelson,* which we quoted at the outset of this discussion. But regardless of this, as we have shown, the evidence does not disclose that appellants in this transaction reposed any particular confidence in Mr. Toner or that they relied on any information given them by him.

There having been no fiduciary relationship shown to exist between the parties, it remains to be seen whether respondents Toner and Cline were, as appellants assert, guilty of fraud, even so.

██ The first allegation of fraud is based on the fact that Mr. Toner concealed his role as purchaser in the transactions. There was some evidence in the record tending to support the trial court's finding that he had valid personal reasons for so doing. But whether or not his reasons were valid, and remembering that there was no fiduciary relation in this case, as in *Ackerson v. Elliott, supra, Frost v. Perfield,* 44 Wash. 185, 87 Pac. 117, and *Tatsuno v. Kasai,* 70 Utah 203, 259 Pac. 318, 62 A. L. R. 54, was he obliged to reveal that he was, in fact, a copurchaser of the property? Were it apparent that appellants would not have sold to Mr. Toner, his nondisclosure of his interest would doubtless amount to fraud. See *Cohn v. Knabb,* 105 Wash. 363, 177 Pac. 794. A person may not be put into a contractual relationship with another with whom he has refused to deal. *Coast Fisheries Co. v. Linen Thread Co.,* 269 Fed. 841. But, as the English court said in *Smith v. Wheatcroft,* L. R. 9 Ch. Div. (Eng.) 223, quoted in an annotation at 121 A. L. R. 1163:

"Does error in regard to the person with whom I contract destroy the consent and annul the agreement? I think that this question ought to be decided by a distinction. Whenever the consideration of the person with whom I am willing to contract enters as an element into the contract which I am willing to make, error with regard to the person destroys my consent and consequently annuls the contract. . . . On the contrary, when the consideration of the person with whom I thought I was contracting does not enter at all into the contract, and I should have been equally

willing to make the contract with any person whatever as with him with whom I thought I was contracting, the contract ought to stand."

See, also, 55 Am. Jur. 572, § 96.

Ida Hood Brown testified that, had she known that Mr. Toner was acting in his own behalf, she did not know whether or not she would have sold her interest in the ranch. But there is nothing else in the record to indicate that either she or Fred Hood had any particular concern with the identity of the purchaser—for a time they seem only to have known him as Mr. Toner's "client"—or that they would have had objections of any kind to Mr. Toner's acquiring an interest in the land. Nor is there any suggestion that they would have been more diligent in ascertaining the correct value of the land, had Mr. Toner disclosed to them his interest in the purchase. We may mention again that, as to that matter, they appear to have relied on their own judgment, rather than on Mr. Toner's. The evidence all points to the conclusion that, had Mr. Toner informed them that, in making his offers, he was acting for himself as well as for Mr. Cline, they would not have responded any differently than they did. Therefore, Mr. Toner's failure to identify himself as copurchaser cannot be said to have amounted to a fraud upon them.

Appellants' charge that Mr. Toner misrepresented the quality and condition of the land needs little consideration. His only representation in this connection appears to have been his comment, in one of his letters to Ida Hood Brown, that the ditches through the property carried morning glory. It is true that this statement appears to have influenced at least Mrs. Brown in her decision to sell the property, but, having been no more than the truth, as all of the testimony plainly showed, fraud cannot be predicated upon it.

Appellants' final charge of fraud is based on their contention that Mr. Toner misrepresented the value of the farm, and that the consideration they received for their interests therein was inadequate. It can hardly be doubted

that Mr. Toner's estimate of the value of the land, including both remainder interest and life estate, at thirty thousand dollars, was low. Considering that there were 310 acres in the farm, this estimate suggested a value of slightly less than one hundred dollars an acre. Appellants' expert witnesses, who were appointed through the state of Washington realty board and who seemed completely impartial, estimated that the property was worth $175 or $180 an acre in 1945; and, though it is true that respondents produced several witnesses who testified that they had bought nearby land for one hundred dollars an acre or less, these transactions all occurred between 1942 and 1944, a period of admittedly rising land values, and obviously involved different land. Respondents' own two most knowledgable expert witnesses testified that the Hood ranch was worth from $115 to $130 an acre in 1945.

It is the general rule, however, that, if a representation is as to value, which is a matter of opinion, it will not, in general, avoid the contract, at least in the absence of a fiduciary relation. See 1 Perry on Trusts 282, § 173. Further, there is no evidence that the appellants relied on this representation—"Ida and I both agree that the farm should be worth more than $30,000.00"—or that, indeed, the value of anything, except their own remainder interest, was of any interest to them—"Whatever amount you would have to pay Augusta Hood wouldn't be any of our concern, I don't think." Therefore, we are unable to say that this representation amounted to fraud, and we are brought to a consideration of the question of the adequacy of the slightly less than seventeen thousand dollars actually received by appellants in exchange for their remainder interest.

In this connection, appellants rely on the rule set forth in Pomeroy, Equity Jurisprudence, 783, 784, § 953a, as follows:

"The rule is well settled that all conveyances, sales, and charges, and contracts of sale or charge, of their future and expectant interests made by heirs, reversioners, and other expectants during the lifetime of their ancestors or life ten-

ants, *upon an inadequate consideration,* will be relieved against in equity, and either wholly or partially set aside. In this instance, fraud is inferred from *mere* inadequacy of consideration. . . . and the burden of proof rests upon the purchaser or other party claiming the benefit of the contract to show affirmatively its perfect fairness, and that a full and adequate consideration was paid. . . . The very fact of the sale or charge shows *prima facie* that he was not in a position to make his own terms, and that he submitted to have them dictated to him by the other party."

█ This rule has received general acceptance as applied to sales of their interests by expectant heirs; but it has very generally been held in this country that the sale of reversionary or remainder estates will not be set aside for inadequacy of consideration when there is no fraud or imposition shown. *Cribbins v. Markwood,* 13 Gratt. (Va.) 495, 67 Am. Dec. 775, is a leading case on the point. This case is summarized in *McAdams v. Bailey,* 169 Ind. 518, 530, 82 N. E. 1057, 124 Am. St. 240, where, after pointing out the English origin of the rule as cited in Pomeroy, the court said:

"The question received full consideration upon the authorities in *Cribbins v. Markwood* (1856), 13 Gratt. 495, 67 Am. Dec. 775, and the doctrine of the English courts was there repudiated, the case being one of a conveyance of a vested remainder. It is shown in that case that in some of the English cases the courts have been disposed to place reversioners and remaindermen in the category of expectant heirs as a matter of public policy, in order to keep them dependent upon the ancestor, to the end that the power of the head of the house may be preserved, and that wealth and titular rank may be transmitted together. No such public policy exists in this country, the court declares, our policy being against the locking up of wealth in families from generation to generation, and therefore it is not necessary for the purchaser to take the burden of making good the transaction. Allen, J., speaking for the court, on page 508, said: 'The inquiry in reference to sales by reversioners or remaindermen, should be whether in the particular case actual fraud existed. . . . In the absence of such proof of actual fraud, I do not think that it is incumbent on the purchaser of such an expectant interest to make good the bargain, by showing that a full and adequate considera-

tion was paid.' And again, it was said on page 507: 'Whatever principle may be adopted in reference to contracts with expectant heirs, secretly selling the chance of a parent's or some relation's bounty, it seems to me that the actual owner of a vested interest in property, whether in reversion or remainder, should not be reduced to the condition of pupilage from regard to any supposed rule of public policy, or for the purpose of extending to him any particular protection.' "

This seems the better rule. As the court later observed in the *Cribbins* case,

"The contracts of such reversioners or remaindermen, like all other contracts, if made by those competent to contract, if they are not gained by ill practice, nor made against the laws, should be kept."

See, also, 1 Perry on Trusts 317, 318, § 188.

■ At first glance, the profit made by Mr. Toner, who bought a half share of the remainder interest for approximately $8,500 in January, 1946, and sold what had become a half share in a fee simple estate for $30,500 in April, 1948, might seem so great as to be unconscionable. But there are two additional factors which must be considered.

The first of these is the notable rise in land values which took place in this section of Washington and Oregon between 1945 and 1948. Although it was generally conceded that this rise had occurred, there was no agreement as to how great it was, the difficulty arising, apparently, from the fact that few sales of land were made in the area during the period in question. Appellants' witnesses seemed to be of the view that the increase was no more than a steady continuation of a trend which had begun in 1941 or 1942, and that, therefore, the rise during the two years after respondents' purchase was not exceptional; while respondents' witnesses tended to take the position that the increase had been relatively slight until the end of the war, after which it had suddenly accelerated. Estimates of the percentage of increase from 1945 to 1948 varied from twenty per cent to seventy-five or eighty per cent. However, no matter what the precise amount of increase actually was—

probably it would be impossible to establish it with any degree of precision—the evidence as a whole unquestionably justified the trial court's observation that every purchaser of wheat and pea land in the area during the five years preceding the trial had made money, and that every seller had lost it.

Secondly, what was acquired by respondents was not a present interest in the property, but a remainder interest, which could not benefit them until the termination of the life estate of Mrs. Hood. It is true that Mrs. Hood was seventy-five years of age in 1945, but she was in good health and active, and the cause of her death could not have been foreseen at that time. This rendered the market value of the remainder interest somewhat uncertain, a matter, as the trial court put it, of conjecture or speculation. Although it may have seemed probable, in 1945, that wheat land would not decrease in value in the near future, this eventuality could obviously not have been predicted with certainty, and if it had done so, and Mrs. Hood had lived for many years more, the price paid to appellants for their interests would not have seemed so inadequate.

As we have noted, in March, 1946, Fred Hood visited the farm. While there he discussed farm values (though perhaps not at great length) "because I began to be suspicious that I made a poor bargain when I sold my equity." Nevertheless, after this trip, he wrote asking for more money, and accepted the balance of the purchase price, as yet unpaid him. In the opinion of the trial court, this amounted to a ratification of the transaction. It strongly indicates, at least, that Mr. Hood was not so dissatisfied with the bargain he had made as to feel he had been defrauded. Appellants did not bring their action until nearly two years had passed, and then only upon the death of the life tenant, which occurred before it might normally have been expected. There seems justification for the trial court's remark to the effect that:

"The court is satisfied that if Mrs. Augusta Hood was still living and the value of the lands now was the same as

at the time of the transaction, the plaintiffs would not now be complaining of this transaction."

One's natural sympathies in this case are with the appellants, who may well have sold their interests in the farm for less than it was worth. Certainly, hindsight indicates that they made a poor bargain. Nevertheless, we may note that the trial judge concluded that the price they received was fair and reasonable, and in any case, as is stated in the headnote to *Opie v. Pacific Investment Co.*, 26 Wash. 505, 67 Pac. 231, 56 L. R. A. 778:

"Mere inadequacy of consideration will not afford cause for rescission of a contract on the ground of fraud, where the parties have dealt at arm's length, with avenues of information open to the one claiming fraud, and where the agreement is entered into after the exercise of the independent judgment of each of the parties."

Under all the facts and circumstances of this case, it cannot be said that the inadequacy of the consideration paid here, if any, was so gross or shocking as to justify making an exception to the general rule.

No fraud having been shown, the judgment of dismissal will be affirmed.

SIMPSON, C. J., MALLERY, HILL, and HAMLEY, JJ., concur.